LILLIE SMITH *v.* NORTH MEMPHIS SAVINGS BANK, Admr.

(*Jackson.* April Term, 1905.)

1. **COMMON LAW.** In its entirety and as a distinctive system was never in force in Tennessee, but only what was in force in North Carolina.

The common law in its entirety and as a distinctive system of laws was never in force in Tennessee, but only such part thereof was in force in Tennessee as had been adopted and was in force in North Carolina when the territory embraced in Tennessee was ceded by North Carolina to the federal government. (*Post, pp.* 17-19.)

Acts cited and approved: 1789, ch. 3.

Cases cited and approved: Porter v. State, M. & Y., 227; Nunnely v. Doherty, 1 Yer., 27; Tisdale v. Munroe, 3 Yer., 320; Egnew v. Cochrane, 2 Head, 320.

2. **STATUTES.** Repealed by Code of 1858, except as therein provided.

The Code of 1858 superseded all other statutory law in this State, including the English statutes previously in force, except as therein specially provided. (*Post, pp.* 18, 19.)

Code cited and construed: Sec. 58 (S.); sec. 42 (M. & V.); sec. 41 (T. & S. and 1858).

Case cited and approved: State v. Miller, 11 Lea, 626.

3. **CODE OF TENNESSEE.** Object to digest and compile existing statutes, not to enact new ones; statutes not presumed to be changed.

The object of the legislature in the appointment of the compilers of the Code of 1858 was to have the then existing statutes digested and compiled, not to draft new laws; and it will not be presumed that in enacting the said Code it was intended to change the laws then in force, but to revise and compile them into a more tangible form. (*Post, p.* 30.)

Smith v. Bank.

Cases cited and approved: Bates v. Sullivan, 3 Head, 633; Burgner v. Burgner, 11 Heis., 733; Hospital v. Fuqua, 1 Lea, 608; State v. McConnell, 3 Lea, 338.

4. **STATUTES. Re-enacted alone, or in a compilation or Code, the judicial construction previously placed upon it forms part of the enactment.**

It is a universal rule of construction that where a statute has received a judicial interpretation, and is afterwards re-enacted, whether alone or in a compilation or a codification of the laws of the State, the judicial construction, which had theretofore been placed upon it, forms a part of the enactment. (*Post, pp.* 30, 31.)

Cases cited and approved: Calhoun v. Little (Ga.), 32 S. E., 86, 43 L. R. A., 633, 71 Am. St. Rep., 254; Anderson v. Bell (Ind.), 39 N. E., 735, 29 L. R. A., 541; Cargill v. Kountze (Tex.), 22 S. W., 1015, 25 S. W., 13, 24 L. R. A., 183, 40 Am. St. Rep., 853,

5. **MARRIAGE. Must be solemnized under statute; common law marriages are void.**

Statutes (Shannon's Code, sections 4189-4200), requiring parties proposing to marry to procure a license and make their contract in the presence of certain officers or a minister of the gospel are mandatory, and abrogate the common law in relation to marriages, and provide a new and exclusive manner in which such contracts should be made, and render common law marriages illegal and void. (*Post, pp.* 15-17, 19-32.)

Code cited and construed: Secs. 4189-4200 (S.); secs. 3294-3305 (M. & V.); secs. 2439-2447 (T. & S. and 1858); secs. 2447a-2447d (T. & S.)

Acts cited and construed: 1715, ch. 1; 1715, ch. 38, sec. 15; 1741, ch. 1, secs. 1, 3, 4, and 6; 1766, ch. 9, secs. 3, 6, 7, and 8; 1778, ch. 7, secs. 3-5; 1815 ch. 47.

Cases cited and approved: Bashaw v. State, 1 Yer., 177; Grisham v. State, 2 Yer., 589.

Cases cited, distinguished, and approved: Johnson v. Johnson, 1 Cold., 630; Andrews v. Page, 3 Heis., 667.

Smith v. Bank.

6. **SAME.** Presumed or established by reputation, when.

In all cases, except prosecutions for bigamy and actions for criminal conversation, a marriage may be presumed, or be established by reputation after a lapse of many years. (*Post, p.* 33.)

Cases cited and approved: Ewell v. State, 6 Yer., 364; Rogers v. Park, 4 Hum., 480.

7. **SAME.** Same. Presumed from cohabitation as husband and wife for a long time, when; estoppel to deny marriage in civil suit; wife's rights as widow.

Where a man and woman lived together as husband and wife for twenty-five years and until the death of the husband, and during all that time had recognized and treated each other as husband and wife, and were so recognized and accepted by the public at large, the deceased husband, if living, would be estopped from asserting that they had been legally married, and hence in a suit by her as complainant to enforce her marital rights as his widow against his estate, it will be presumed as against his personal representative that they were legally married and such representative is estopped · to controvert her rights as widow and distributee of such decedent. (Post, *pp.* 15-17, 32-36.)

FROM SHELBY.

Appeal from the Chancery Court of Shelby County.— F. H. HEISKELL, Chancellor.

HENRY CRAFT, for complainant.

No counsel marked for defendant.

MR. JUSTICE SHIELDS delivered the opinion of the Court.

Complainant sues the defendant, as the administrator of Joseph Smith, deceased, for the estate of the decedent remaining in its hands after payment of indebtedness and costs and expenses of administration, claiming the same as widow and sole distributee of the intestate.

The defendant, answering, admits that it is the administrator of Joseph Smith, deceased, and that it has in its hands a fund due to his distributees, but denies that the complainant is his widow and distributee and entitled to the fund. It admits that it has no knowledge of any next of kin of the decedent, and that complainant is the only claimant of the estate in his hands. It expresses a willingness to pay over the estate to whomsoever the court may hold to be entitled to it.

The record discloses these facts:

Joseph Smith and the complainant, then Lillie Kimes, both being capable to contract marriage, mutually agreed to live together as man and wife, and in 1878, without license or any ceremony, complainant assumed the name of Lillie Smith and all the duties of a lawful wife. They lived and cohabited together, keeping house as married people, from then until the death of Joseph Smith, in 1903, and during that period recognized and treated each other as husband and wife, and were so recognized and accepted by their friends and acquaintances, and the public generally, in the community where they resided, and it was not known by

any one but themselves that they had not procured license and entered into a marriage contract before one of the officers, or a minister of the gospel, authorized by statute to solemnize the rites of matrimony, until after the death of Joseph Smith. It does not appear where they were when they agreed to become husband and wife, but from about that time until the death of Joseph Smith they resided in Memphis, where he engaged in business.

Complainant insists that the agreement made by Joseph Smith and herself in 1878 constituted a valid common-law marriage, and from that time until the death of the decedent she was his wife, and since is his widow, and entitled to all the rights in his estate allowed widows of decedents by the laws of Tennessee.

She further insists that, regardless of whether or not a common-law marriage is valid in Tennessee, said Joseph Smith, after having lived with her and recognized and held her out to the world as his wife for more than twenty-five years, would, if living, be estopped from asserting to the contrary in any civil action she might institute to enforce marital rights, and that his personal representative, standing in his place, is estopped to controvert her claim as widow of its intestate.

Without stating the evidential facts tending to prove it, further than is already done, we find that there is made out in the record a clear case of common-law marriage between Joseph Smith and the complainant, entered into in 1878, and that they lived and cohabited

together as man and wife until his death in 1903, without the validity of their pretended marital relations being called in question by either of them or others.

The question then presented is whether a common-law marriage contracted in Tennessee is valid?

Marriage under the common law was purely a civil contract. No particular form was required to be observed by parties entering into it. A simple agreement made by a man and woman that they would live together as man and wife constituted a valid marriage.

It is said for the complainant that the common law in its entirety was adopted in this State, and is yet in force, except so far as superseded or modified by affirmative statutes; that the provisions upon this subject contained in our Code (Shannon's Ed., sections 4189-4200), requiring parties proposing to marry to first procure license and make their contract in the presence of certain officers or a minister of the gospel, are not mandatory; and that valid marriages may now be contracted in the State, either in the common-law form or as prescribed by these provisions.

We are of the opinion that this contention is not tenable. The common law in its entirety was never in force in Tennessee. As a distinctive system of laws it was never adopted by our general assembly or other authority, and obtained in Tennessee only as a part of the laws of North Carolina, in so far as it had been adopted and was in force in that State when this territory was ceded by it to the federal government.

115 Tenn—2

The general assembly of North Carolina, by a statute enacted in 1789, declared that such parts of the common law and the acts of the late general assemblies, not inconsistent with and repugnant to the freedom and independence of the people or the form of government then established, should continue in force in that State, which then included Tennessee, and the common law and statutes so declared to be in force, save as repealed and amended by subsequent statutes of North Carolina, were the law of this territory so long as it was a part of that State. *Porter* v. *State*, Mart. & Y., 227; *Tisdale* v. *Munroe*, 3 Yerg., 320; *State* v. *Miller*, 11 Lea, 625.

The cession act, enacted by the general assembly of North Carolina in 1789 and accepted by the congress of the United States April 2, 1790, provided that the laws in force and in use in North Carolina at the time of passing that act should be and continue in full force in the territory ceded until the same should be repealed or altered by the legislative authority of the territory. *Nunnely* v. *Doherty*, 1 Yerg., 27.

And by our constitutions adopted in 1796 and 1834 it was provided that all laws then in force in the territory previous to 1796, and those in Tennessee previous to 1834, not inconsistent with those instruments, respectively, should continue in force until they should expire, be altered, or repealed by the general assembly. *Egnew* v. *Cochrane*, 2 Head, 320.

This was the status of the common law and the statutes of North Carolina previous to the cession act,

in Tennessee, save as modified by subsequent legisla-
tion, until the adoption of our Code of 1858, which
superseded all other statutory law in this State except
as therein specially provided. Code, 1858, section 41
(Shannon's Code, section 58); *State* v. *Miller,* 11 Lea,
626.

North Carolina, early in its history, began to legis-
late upon the subject of the marriage relation, and pre-
scribed the form and manner in which it should be con-
tracted, and the statutes enacted by its legislature pre-
vious to the cession act continued in force in Tennessee,
with but slight alterations, until the adoption of the
Code in 1858, and are substantially carried into it.
Therefore, in order to fully understand our present
statutes upon this important subject, and ascertain the
intention of the legislature in enacting them, it is nec-
essary that we examine those of North Carolina passed
in the period referred to and of this State passed before
1858. Those of North Carolina and of Tennessee pre-
vious to 1829 are reviewed in the able and exhaustive
opinion of this court, delivered by Judge Whyte, in the
case of *Bashaw* v. *State* (1829), 1 Yerg., 177, which in-
volved the precise question now under consideration,
and, although quite lengthy, we can do no better than
quote from it. It is there said:

"The legality of the first marriage must therefore de-
pend upon the acts of assembly of the State of North
Carolina passed before the separation of the State of
Tennessee from the State of North Carolina, and the

acts of Assembly of the State of Tennessee passed since
that separation. These acts have all been cited and
commented upon by the counsel upon both sides; and
upon them, on the part of the State, it is argued that
they are all affirmative statutes, except one clause, or
section, in the act of 1776, and that is virtually re-
pealed by the act of 1778, and therefore they do not re-
peal the common law, by which law the marriage with
Sally Cole is a valid marriage. On the other side, it
is argued that these acts of assembly are introductive of
a new law respecting marriage, inconsistent with the
common law, superseding it, and establishing, as a con-
sequence, that the putative marriage of the plaintiff in
error with Sally Cole is not a valid marriage. The
construction of these acts of assembly, on legal princi-
ples, must be had on a view of them taken altogether.
Lord Mansfield, in the case of the *King* v. *Lansdale* and
Others, 1 Burrows' Rep., 447, lays it down that 'where
there are different statutes *in pari materia,* though
made at different times, or even expired, and not re-
ferring to each other, they shall be taken and construed
together as one system and as explanatory of each
other;' and he instances the laws concerning church
leases, those concerning bankrupts, and those providing
for the poor, as one system relative to the subject, re-
spectively. A short view of our acts of assembly re-
specting marriage will therefore be taken. The first
act is St. 1715, c. 1. We know nothing of it in cer-
tainty except its title, which is: 'An act concerning

Smith v. Bank.

marriages.' It is noted in the oldest revisal of the North Carolina laws within our reach [Davis' Revisal of 1773] as obsolete, and only now noticed by us as showing that at a very early period after the organization of the colonial government the subject attracted the attention of its legislature, and was by them considered of sufficient magnitude to require legislative interference by act of assembly. The next act is the thirty-eighth chapter of the same year (section 15), requiring the registration of all marriages, and imposing it a duty on every married man to remit to the register a certificate of his marriage and cause the same to be registered, under a penalty. The next is St. 1741, c. 1, entitled 'An act concerning marriages.' Section 1 commences as follows: 'For preventing clandestine and unlawful marriages, it is enacted,' etc., 'that every clergyman of the church of England, and for want of such, any lawful magistrate shall join together, in the holy estate of matrimony, such persons who may lawfully enter into such a relation and have complied with the directions hereinafter mentioned.' Section 3 says: 'No minister or justice of the peace shall celebrate the rites of matrimony between any persons, or join them together as man and wife, without license first had and obtained for that purpose, according to the directions of this act, or thrice publication of the banns as prescribed by the book of common prayer.' And in the following clause it says: 'If any minister or justice of the peace shall, contrary to the true intent

and meaning of this act, celebrate the rites of matrimony,' etc., 'he, or they, shall forfeit and pay the sum of fifty pounds.' Section 6 directs the license to be issued by the clerk of the county where the *feme* resides, and then only under the rules prescribed; that is, he shall take bond, with security, in the penalty of fifty pounds, that there is no lawful cause to obstruct the marriage for which the license is desired; and in the case of minors, if not heretofore married, the consent of the parents or guardian be personally given before the said clerk, or signified under the hand and seal of the parent or guardian, attested by two witnesses, which being done, the clerk shall write the license or consent as aforesaid, to the first justice in commission of the peace, or such other person as the governor shall appoint. And a license so obtained is declared a lawful license, and no other. And by a subsequent clause, if the clerk issue a license, or make a certificate of license other than directed by the act, he shall forfeit and pay fifty pounds. The next act is St. 1766, c. 9. Its title is 'An act to amend an act entitled "An act conconcerning marriages."' This act, in its leading features, is of the same import as the act of 1741. It expresses, recapitulates, and reenacts the great requisites necessary to the constitution of a legal or valid marriage, and enforces their observance under penalties. It makes some alteration as to the persons authorized to solemnize the rites of matrimony, extending the provision. The first section recites 'that whereas by the

Smith v. Bank.

act of 1741, no minister or justice of the peace shall celebrate the rites of matrimony between any persons without license or certificate of publication; and whereas the Presbyterian or dissenting clergy, conceiving themselves not included in the restriction of ministers mentioned in that act, have joined persons together in holy matrimony without either publication or license,' etc. The second section declares all marriages that have been solemnized by the dissenting or Presbyterian clergy, legal and valid. In the seventh section it is made lawful for any Presbyterian minister to celebrate the rites of matrimony in their usual and accustomed manner, under the same regulations and restrictions, as any lawful magistrate might do the same. And section 8 requires the marriage so solemnized by any Presbyterian minister to be under license from the governor. The third section, that no minister of any church of England or justice of the peace shall, under the penalty of fifty pounds, solemnize any marriage or join any persons together as man and wife, without certificate of thrice publication of banns, according to the directions of this act, or license first had under the hand and seal of the governor, who is authorized to grant the same on certificate of the clerk of the county court of his having taken and filed in his office the usual bond, in the penalty of fifty pounds, that there is no lawful cause to obstruct the marriage for which the license is desired. The sixth section imposes the same duty upon the clerk, before making the certificate to

the governor under the third section of this act, that it did by the fourth section of the act of 1741, before he issued the license and under the same penalty. The last clause of the eighth section says: 'And that all marriages solemnized as aforesaid, without such license, shall be and are hereby declared illegal and void.' The next act (1778) is in substance the same as the preceding acts of 1741 and 1776, authorizing in the second section all regular ministers of the gospel of every denomination, having the care of souls, and all justices of the peace, to solemnize the rites of matrimony according to the rites and ceremonies of their respective churches, and agreeably to the rules in this act prescribed. By section 3 the power of granting license is given to the clerk of the county court in which the *feme* resides, he first taking bond in the name of the governor and his successors, with sufficient security, in the sum of five hundred pounds, that there is no lawful cause to obstruct the marriage. By section 4 every minister of the gospel, qualified as in the act directed, or other person appointed by the church a reader, is authorized and empowered to publish the banns of matrimony, which shall be made three several Sundays, and shall give a certificate of such publication directed to any authorized minister or justice of the peace. And by section 5, if any minister or justice of the peace shall knowingly join together in matrimony any two persons in any way or manner, other than by this act directed, he shall forfeit and pay for every such offense

the sum of fifty pounds. And if any clerk shall knowingly grant marriage license in any way or manner, other than in this act directed, he shall forfeit and pay the sum of one hundred pounds. Acts 1815, c. 47, requires the minister of the gospel, or the justice of the peace, who solemnizes the rites of matrimony, to indorse on the back of the license the time of the marriage, and to sign his name thereto, and return the license to the clerk of the county court, whose duty it shall be to file the license in the office, which license and certificate shall be considered as competent evidence of the said marriage."

The provisions of our Code (Shannon's Edition) and the statutes amending them since its enactment, in relation to this matter, are as follows:

"Sec. 4189. All regular ministers of the gospel of every denomination, and Jewish rabbis, having the care of souls, and all justices of the peace, judges, chancellors, the governor, speaker of the senate, and speaker of the house of representatives in the State, may solemnize the rite of matrimony.

"Sec. 4190. No formula need be observed in such solemnization, except that the parties shall respectively declare, in the presence of the minister or officer, that they accept each other as man and wife.

"Sec. 4191. Before being joined in marriage, the parties shall produce to the minister or officer aforesaid, a license under the hand of the clerk of the county court where the female resides, or where the marriage is sol-

emnized, directed to such minister or officer, authorizing the solemnization of a marriage between said parties.

"Sec. 4192. The clerk may issue such license to any one applying for the same, unless he knows that one of the parties is incapable of marriage, first taking bond to the State, with sufficient surety, in the sum of twelve hundred and fifty dollars, conditioned that there is no lawful cause to obstruct the marriage for which the license is desired; for which penalty any person aggrieved by the marriage may sue. (1778, c. 7, section 3.)'

"Sec. 4193. The minister of the gospel, or Jewish rabbi, or justice of the peace, or judge, or chancellor, or governor, or speaker of the senate, or speaker of the house of representatives, who solemnizes the rite of matrimony, shall indorse on or append to the license the time of the marriage, and sign his name thereto, and return the license to the clerk of the county court within six months thereafter.

"Sec. 4194. The clerk shall, at the foot or on the back of each license, place the following form of certificate, to be signed by the person solemnizing the marriage: "I solemnized the rite of matrimony between the above (or within) named parties on the ——— day of ———, 18—."

"Sec. 4195. If a clerk knowingly grant marriage license to persons incapable thereof, he shall forfeit and pay a fine of five hundred dollars, to be recovered by

action of debt, for the use of the person suing.

"Sec. 4196. If any minister or officer knowingly join together in matrimony any two persons not capable thereof, he shall forfeit and pay the sum of five hundred dollars, to be recovered by action of debt, for the use of the person suing.

"Sec. 4197. In each of the foregoing cases, the party violating these provisions shall be guilty of a misdemeanor. . . . .

"Sec. 4199. All marriages contracted and entered into during the late rebellion and duly solemnized as the law directs are hereby declared valid to all intents and purposes, and the issue of said marriages are hereby declared legitimate.

"Sec. 4200. Whenever any marriage in this State may have been heretofore or may hereafter be celebrated between persons, by license regularly issued as required by law, the same shall be valid and binding in law, and the issue thereof is hereby declared legitimate, although the baptismal name of either party may be omitted in said license, and a nickname be used instead thereof, provided the parties may have consummated the marriage by cohabitation, and can be identified as the persons between whom such marriage was solemnized." Shannon's Code, sections 4189-4200.

It was held by this court in this case (*Bashaw* v. *State,* supra) that the statute therein considered abrogated the common law, in relation to marriage contracts and provided a new and exclusive manner in

which such contracts should be made, and all marriages attempted to be entered into without an observance of the statutes were declared to be null and void. Judge Whyte, for the court, says:

"The more important provisions of these acts of assembly are almost entirely the same, exhibiting a settled purpose to fix and regulate the contract of marriage so as to rest or be dependent on municipal law alone, establishing a system intended to be complete in itself, evidenced by the attention paid to every particular, in form as well as substance, which the importance of such a relation, both in a private and a public view, so deservedly merited. Hence, these acts of assembly, as was intended by them, operate and effect a change in the form and substance of the marriage contract, and its solemnization, from what it was at the common law: (1) In requiring publicity and permanency of its evidence, by the registration of the marriage, and filing the license and certificate of marriage, by the acts of 1715 and 1815. (2) In requiring a regular, certain authority, empowering the solemnization of the marriage, which is a license of a certificate of the publication of banns, by the acts of 1741, 1766, and 1778. (3) In requiring the actual solemnization of the marriage ceremony by a person properly qualified, who is a clergyman of the church of England, or a justice of the peace by the act of 1741; a minister of the church of England, a Presbyterian or dissenting minister, or a justice of the peace by the act of 1776; and a

regular minister of the gospel having the care of souls, or a justice of the peace, by the act of 1778. In requiring the consent of the parent or guardian, when the parties or either of them are under the age of twenty-one, and not theretofore married, by Act 1741, section 6, which is legally provided for in the act of 1778, requiring the first taking bond, before the license is granted, in the name of the governor and his successors, with sufficient security, in the sum of five hundred pounds, with condition that there is no lawful cause to obstruct the marriage for which the license is desired. These requirements change wholly the manner of solemnizing the matrimonial union from what it was at the common law, declaring and enacting that they shall be complied with in the future, and that the celebration of marriage shall not be otherwise than as directed in these acts, and enforcing the performance and due execution of them under forfeitures and penalties recoverable by law, besides the express declaration in terms 'that all marriages, solemnized as aforesaid, without such license first had, shall be and are hereby declared illegal and void.' We say that these requirements, under these circumstances, constitute such a body of proof as to render irresistible, in our opinions, the correctness of the position that a marriage, to be valid, must be according to these acts, and that the common law is wholly superseded on the same subject by them. To say otherwise would be not only to prostrate the well-directed labors of the legislature on the subject for the

last one hundred years, but on our part the expression of a gratuitous and improper assumption that the legislature did not intend what they have so repeatedly and expressly declared."

This case was approved and followed in that of *Grisham* v. *State,* decided by this court in 1831, and reported in 2 Yerg., 589.

These cases are controlling and conclusive of this one. The provisions of the Code (1858) relating to the form and manner of entering into the marriage relation are a re-enactment of the statutes of North Carolina and Tennessee upon this subject and construed in *Bashaw* v. *State,* supra, and must be given the same force and effect. The object of the legislature in the appointment of the compilers of the Code was to have the then existing statutes digested and compiled, not to draft new laws; and this court has held that it will not be presumed that in enacting the Code it was intended to change the laws then in force but to revise and compile them into a more tangible form. *Bates* v. *Sullivan,* 3 Head, 633; *Burgner* v. *Burgner,* 11 Heisk., 733; *Tennessee Hospital* v. *Fuqua,* 1 Lea, 608; *State* v. *McConnell,* 3 Lea, 338.

And it is the universal rule of construction that where a statute has received a judicial interpretation and is afterwards re-enacted, whether alone or in a compilation or a codification of the laws of the State, the judicial construction which had theretofore been placed upon it, forms a part of the enactment. 26 Am. & Eng.

Smith v. Bank.

Ency. of Law, 650, and cases there cited; Sutherland on Stat. Construction, sections 255, 256; *Calhoun* v. *Little* (Ga.), 32 S. E., 86, 43 L. R. A., 633, 71 Am. St. Rep., 254; *Anderson* v. *Bell* (Ind. Sup.), 39 N. E., 735, 29 L. R. A., 541; *Cargill* v. *Kountze Bros.* (Tex. Sup.), 22 S. W., 1015, 25 S. W., 13, 24 L. R. A., 183, 40 Am. St. Rep., 853.

We are, therefore, satisfied, and hold, that it was the intention of the general assembly, in enacting the provisions of the Code of 1858 upon the subject under consideration, to abrogate the common law in relation to marriages, and provide a new and exclusive manner in which such contracts should be made. This has been the construction which has been placed upon the original statutes and the provisions of the Code since the decision of the case of *Bashaw* v. *State,* supra, by the courts of this State, and it should not now be disturbed. But we fully agree with the reasoning of our predecessors in *Bashaw* v. *State,* and if the question was one of first impression we would hold as there held. There are only two cases in our reports in which this construction of our statutes has been doubted in the slightest. They are *Johnson* v. *Johnson,* 1 Cold., 630, and *Andrews* v. *Page,* 3 Heisk., 667, and are all that are relied upon in the brief for complainant. In *Johnson* v. *Johnson,* Judge McKinney, speaking for the court, refers to *Bashaw* v. *State* as holding that the common law upon the subject of marriage contracts in Tennessee was abrogated by statute, and declines to express an opinion

whether the decision was sound in principle or supported by authority, but follows it in the case then under cons'deration. The case of *Andrews* v. *Page* involved the validity of a marriage of negroes while slaves, and the construction of a statute in 1866 validating such marriages. It did not involve the validity of a common-law marriage between white persons, and, while the case of *Bashaw* v. *State* was criticised, it was not overruled or modified. The first assignment of error of the complainant must be decided against her.

We are, however, of the opinion that the second contention of the complainant must be sustained, upon the authority of the case of *Johnson* v. *Johnson,* supra. As above stated, these parties, Joseph Smith and the complainant, who lived together as man and wife, in Memphis, for more than twenty-five years, during all that time had recognized and treated each other as husband and wife, and were so recognized and accepted by the public at large. Joseph Smith, if alive, would be estopped to deny his liability for any contracts which the complainant might have made which would have bound a husband in lawful marriage, such as for necessaries and also in any proceeding begun by the complainant to enforce a right claimed by her in virtue of the reputed marital relations. This doctrine was announced and enforced by this court in *Johnson* v. *Johnson,* supra, where the reputed wife, in litigation with the reputed husband, was held to be estopped to deny the validity of her marriage after a lapse of twenty-five years, Judge

McKinney, speaking for the court, says:

"For nearly a quarter of a century before the filing of this bill, the parties had cohabited as husband and wife, believing all that time that they had been lawfully married, as did all others with whom they had intercourse. And the question whether, after so great a lapse of time, such a marriage can be declared void from the beginning, is one in which not only the parties but the public also have a deep interest, in view of the consequences as affecting the status of children born of the marriage, the relations of affinity and consanguinity which may have sprung from it, the rights of property which may have been acquired on the faith of it, and all the consequential rights, obligations, and duties growing out of it.

"Upon established principles and analogies of the law, we think it may be held that under the circumstances of this case a lawful marriage for all civil purposes will be conclusively presumed, and that neither the parties themselves, nor third persons, perhaps, will be heard to disprove or deny the marriage.

"It is a familiar doctrine that in all cases, except prosecutions for bigamy and actions for criminal conversation, a marriage may be presumed, or be established by reputation after a lapse of many years. *Ewell* v. *State*, 6 Yerg., 364; *Rogers* v. *Park's Lessee*, 4 Humph., 480.

"And the principle is equally familiar that where persons have represented themselves to be married; or

115 Tenn—3

have assumed the relation of husband and wife, cohabiting and holding themselves out to the public as such, though not in fact married, they will, when it is sought to charge them with any of the civil liabilities growing out of that relation, be conclusively presumed to sustain such relation to each other, and will not be permitted to disprove or deny the marriage. 1 Greenl. on Ev., sections 27, 207. It is laid down by Starkie that in an action against husband and wife, it is sufficient to prove the marriage *de facto* by evidence of cohabitation, acknowledgment, or reputation; and they cannot prove in defense that they were not legally married. 2 Stark. on Ev. (3d Am. Ed.), 291; 2 Salk., 437; *Divoll v. Leadbetter,* 4 Pick., 220.

"Whether or not such persons can acquire rights as against others, it is clear that others may acquire rights against them. And the principle of estoppel upon which this doctrine rests and which is based upon principles of morality, as well as of public policy, must be held to apply equally to both parties. The woman in such a case is no more privileged to commit fraud or crime than the man.

"And if they are estopped as to third persons, why shall they not, as against each other in all civil cases, be also precluded other in all civil cases, be also precluded from gainsaying the marriage? Do not the same reasons of morality and policy apply in the one case as in the other? And more especially should they be held to be estopped as between themselves, when

either is seeking to disturb or defeat rights which may have been acquired by the other, either directly or indirectly, on the faith of the marriage.

"In the case of *Divoll* v. *Leadbetter,* 4 Pick., 220, which was an action of trespass for breaking and entering plaintiff's close, it appeared that the land of the reputed wife of the defendant had been taken and expended upon the rents and profits for the term of four years as the freehold of the defendant in right of his supposed wife. To defeat the title thus acquired the defendant attempted to prove the invalidity of the marriage. A marriage in lawful form had taken place, but, the parties being within the prohibited degree of kindred, it was void under the statute. It was held that the defendant could not set up the illegality of the marriage as a defense to the action; that it would be contrary to morality, as well as the policy of the law, to permit him to claim any right or exemption on account of his own crime.

"In the case of *Wilkinson* v. *Payne,* 4 Term Rep., 468, which was an action on a promissory note given to the plaintiff in consideration of his marrying the defendant's daughter, the defense was that, though there was a marriage in fact, it was not a legal marriage. On the trial it was left to the jury to presume a subsequent legal marriage, which they accordingly did; and the court of king's bench was unanimous in refusing a new trial. Lord Kenyon, in delivering the judgment, said that, 'though the first marriage was defective, a subse-

quent one might have taken place; that the parties had cohabited together for a length of time, and were treated by the defendant himself as man and wife; and these circumstances afforded a ground on which the jury might presume a subsequent marriage.'

"In 3 Phillips on Evidence (Ed. 1843), 286, it is said the usual presumptive proofs arising from the cohabitation of the parties as man and wife have not been taken away by the marriage act, and that, although the existence of license or publication of banns may be disproved, yet even in such a case there may be sufficient ground for presuming a subsequent legal marriage from the cohabitation of the parties as man and wife and other circumstances. 1 Black, 367; Peake's N. P., 232."

We think that the case at bar is on all fours with that of *Johnson* v. *Johnson,* and that since Joseph Smith, if alive, would be estopped to deny that the complainant was his wife in a proceeding to enforce a right growing out of such relation, his personal representative is estopped to controvert the rights of the complainant as widow and distributee of the decedent.

The decree of the chancellor will be reversed, and one entered in accordance with this opinion.