# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed June 14, 1916.

MARY K. FEEHLEY
VS.
TIMOTHY J. FEEHLEY.

*J. Richard Standiford* and *Edwin T. Dickerson* for plaintiff.

*Baum & Sykes* and *William H. Lawrence* for defendant.

BOND, J.—

This couple was married in 1891, divorced in 1896 and each married to another spouse; then each was divorced again; and finally they came together again, living in the same house with their daughter. Now this is a bill by the woman alleging remarriage and praying separate maintenance and support, or permanent alimony, and for the sale of property held in the names of both. It is questioned, first, whether there has been any valid remarriage of these parties. No license was obtained for it; and there was no publication of banns. And the fact of a religious ceremony is disputed. And, then, second, assuming a remarriage, the existence of sufficient ground for a separate maintenance is questioned.

The license and the banns are, for all our purposes, equal formalities; and so, discussing the validity of a marriage without either of them, we may, for brevity, speak simply of the requirement of a license.

The Court of Appeals of Maryland has never had to pass on this question. But it is at once pointed out that decisions in other states have generally held that the statutory requirement of a license, or other like formality, is directory and not mandatory, and that a marriage without the license is valid unless the statute law itself provides that it shall not be so.

1 Bishop on Marriage and Divorce, Sec. 426.

26 Cyc. 850, "Marriage."

*Contra:* Smith vs. North Memphis Savings Bank, 115 Tenn. 12.

But the question is, I think, one which should not be dismissed as answered merely by reference to decisions elsewhere. The courts of Maryland have always stood apart, at least since the case of Denison vs. Denison, 35 Md. 361, in their view of the formalities with which the marriage contract has been surrounded. Except in Maryland, Massachusetts, Virginia and West Virginia, all American courts have leaned strongly in favor of marriages by mere consent; and they have interpreted statutes in that spirit. All of them, starting with this viewpoint, have at one time or another recognized common-law marriages; the four states mentioned have always denied them.

Freund's article in 24 Harvard Law Review, 548.

And it seems to have been largely because of this preconception in the other states that the requirement of a license has been held directory only. This distinction in the effect given a statutory prohibition, making it, as we say, directory or mandatory, is as a rule not inherent in the words of the statute itself. It is rather a necessary judicial instrument to fit the statute to actual conditions and consequences which the legislature must or should have had in mind. It has undoubtedly been widely used to modify legislation so as to avoid what seemed to the courts to be harsh results in practical application.

Upshur on Construction of Statutory Law, pp. 317 and 324.

2 Sutherland on Statutory Construction, Secs. 610-611.

And so it has been, I think, with the decisions in other states on the question before us. The rule they adopted was frequently felt to be demanded, especially in earlier days, when the statutes were new, to protect well-meaning ignorance. Or, for other reasons, the judges felt that the prescribed formalities should not be permitted to invalidate an attempted marriage. But this view is now being given up. Several states have more recently abolished common-law marriages, and have made the license and public record essential to the validity of marriage within their jurisdictions. And the Commissioners of Uniform State Laws have now, as a result of several conferences, recommended for adoption in all the states an act which does both of these things: abolishes common-law marriages and makes a license essential. To my mind, then, the state of the authorities elsewhere falls far short of solving our problem.

The Court of Appeals, as has been said, has never had to pass on this question, the Denison case having had to do only with the lack of a religious ceremony. The statute, Article 62, Section 4, of the Code, provides that "No person within this State shall be joined in marriage until a license shall have been obtained," etc. And this is a clear categorical prohibition: as clear as words can form. There is no such positive statutory requirement of the religious ceremony; yet the Court of Appeals has found it to be clear enough that the policy of our law, as well as the custom of the people, made the religious ceremony essential. Marriage without some such ceremony had become inconceivable here, and this view seemed to find expression in the statutes. The alternative of recognizing common-law marriages, *per verba de presenti* or *per verba de futuro cum copula*, was rejected; and I believe no considerable portion of the people of the State would have the law otherwise. Now, not only is the formality of a license commanded in positive terms; it seems more necessary than the religious ceremony for the attainment of objects which the legislature may be considered to have had in mind. The difference between a marriage with a license and marriage without one is the difference between a marriage recorded publicly and a marriage which may be established by verbal testimony. And the experience of other states gives reason to believe that the privilege of marrying without a record by the civil authorities is now of value

mostly as foundation for blackmail or fraudulent attacks on the estates of decedents. Given the disposition to give false testimony, the requirement of some religious ceremony would not by any means oppose an insuperable difficulty.

And so, if we are to construe the statute to be mandatory or directory, according to the effects which the legislature may be supposed to have intended, these possible evil effects of giving it a merely directory force argue potently against that construction.

And I do not think the legislature in this State may be supposed to have intended to protect any well-meaning ignorance of the license requirement. Practically, there is no such ignorance. I believe the license is almost universally viewed in Maryland as an essential to marriage. And I do not doubt that this fact has helped to save us from the evils which have developed in other states upon the institution of common-law marriages. A ruling by the courts now that a license is not essential to the validity of a marriage will, I believe, come as a surprise to nearly all the people of this State.

It seems to me, then, that there is in these considerations no reason for the court's giving the statute a directory effect only, and much reason against its doing so. Freund says that the controlling consideration with the Commissioners of Uniform State Laws in recommending that a license be made everywhere essential "was that in this way alone adequate recognition was given to the civil character of the marriage contract."

24 Harvard Law Review, 549.

I have stated these views so far because it has seemed to me that there has been too ready an acceptance of outside decisions for a solution of the question here, and that if the question should be carried before the Court of Appeals these arguments should be presented by counsel for consideration.

A final consideration has led me to adopt. with some hesitation, the conclusion that the requirement of a license in our statute should nevertheless be construed as directory merely. The requirement in its present words was enacted by the General Assembly in 1886, Chapter 497, Section 4. It was the same legislature, in the same Act, which enacted the proviso (now in Sec-

tion 11 of Article 62), "that should any minister or other persons marry persons without such license, he shall on conviction thereof be fined," etc. It may, with some plausibility, perhaps, be argued that this is only an additional measure to assure the taking out of the necessary license; that "marry" is intended to mean no more than attempt to marry, valid marriage being impossible in the supposed absence of a license. But I have not been able to take that view of it. The provision seems to me to imply that, according to the understanding and intention of the legislature, a minister might validly "marry persons without such license." So I conclude in the present case that if there was a religious ceremony of carriage then a valid marriage has been formed notwithstanding the lack of license or publication of banns. I have, as I say, come to this conclusion with some hesitation; and I hope the opinion of the Court of Appeals may be had on the whole question.

The Denison case had settled all question of the effect of lack of a religious ceremony. There can be no valid marriage in Maryland without it. And the only question here is whether there was such a ceremony. There were four witnesses to this fact. The mother and her daughter testified in detail to a complete formal marriage ceremony by a priest. The husband, on the other hand, while admitting that there was a ceremony of some sort, denied that it was a marriage ceremony, or that it was intended so to be. He says it was a blessing and that there was something said in Latin, holy water used, and a wedding ring which he put on the plaintiff's finger at the conclusion of the ceremony. And after that time the woman was generally known as his wife and was introduced by him as such. Property was bought in the names of "Timothy L. Fechley and Mary K. Fechley, his wife." The deposition of the priest is not clear. He denies flatly that there was a marriage by him. Yet he says there was some sort of a ceremony, with a wedding ring; and that "they consented to take each other as man and wife—that was all." According to the rules of his church he could not regard them as ever having been divorced, and he could not marry the married. Nevertheless, he performed some religious ceremony

to start them upon their married life again. I think we need not dwell upon his distinctions. There was, I conclude, a religious ceremony of marriage such as the Code requires, and I shall hold the parties married.

Without discussing the evidence further, I conclude that ground for separate maintenance, or permanent alimony, has been established. But I find it impossible to fix a sum to be paid by the husband because his earnings and resources are not clearly shown in the testimony. I shall, therefore, need further testimony or a stipulation upon that fact. The wife will be awarded a one-third share in the property; and it will have to be paid over to her by means of a sale unless the parties agree on some other method. If necessary a receiver and trustee will be appointed to make the sale and division of proceeds.

The cost will be paid by the husband.

A final decree in accordance with these views will be signed when the additional testimony or stipulation is produced.