DUGGAN v. OGLE et al.—159 S. W. (2d), 834.

Eastern Section.   November 5, 1941.

Petition for Certiorari denied by Supreme Court, February 28, 1942.

R. L. Ogle, of Sevierville, and George S. Child, of Knoxville, for appellants.

E. E. Creswell, of Sevierville, for appellee.

PORTRUM, J. This bill was filed as an interpleader by the administrator of the estate of Hugh Myers, deceased, to determine the ownership of a fund of $4,000 recovered in an action by the administrator against a third person for the wrongful death of the said Hugh Myers, in an automobile accident, which fund, under an agreement, is in the hands of the clerk of the court awaiting the deter-

mination of the ownership. The deceased left a reputed wife and two infant children who claimed the fund as next of kin; the father and mother of Hugh Myers assert that he was never legally married and that they are entitled to the fund as his next of kin because of the survival statute. The issue presented is the legal right growing out of the marriage be it valid or void.

There are three factual solutions to this issue; first, there was a legal marriage; second, Hugh Myers practiced a fraud upon his acknowledged wife, Blanche Ogle Myers, and had a moot ceremony performed in her ignorance; third, or Blanche Ogle Myers has sworn falsely, and there was no ceremony performed.

At the outset we will dispose of the third solution. We believe that Blanche Ogle Myers swore truthfully, in fact we were impressed with her testimony. It is free of equivocations or evasions, and this statement cannot be made in reference to the testimony of those who try to discredit her. All proven facts and circumstances are consistent with her testimony, while the opposing witnesses must explain and disclaim these facts and circumstances. This conclusion will be reflected in the following discussion of the evidence. She details her story as follows:

In January, 1937, she was a young girl in her seventeenth year, and she met Hugh Myers at some place where the young people gather, attending picture shows and other places of amusement with him, and having dates with him from time to time at these places. Both lived in the country and he did not go to her home to see her, and her father was ignorant of the association. This courtship continued until the 22nd day of December, 1937, when by prearrangement he came to her home or near her home and met her, taking her in a car back with him to near his home where his brother, Ray Myers, got in the car with them, and they drove to Maryville and parked the car upon the street, the brother Ray Myers going one way and they another. She states that Hugh took her to the courthouse and to the office of a justice of the peace there, and that they were married there by a justice of the peace. They then returned to the car, having been away from it about one hour, and found Ray Myers and the three drove to Knoxville, arriving there about noon and attending the afternoon picture show. After the picture show they returned to Sevier County and Hugh drove her to her home, but left it to her to tell her father of the marriage. Hugh returned to his home.

She told her father of the marriage and that her husband, since he was engaged in driving a truck, would spend Wednesday nights with her and would spend Saturday nights and Sundays with her. The husband lived with his parents and did not immediately tell them of his marriage, and continued to drive his truck, but he visited his wife on the designated occasions, and soon after the marriage he told his wife's father of the marriage.

The mother of Hugh Myers first learned of the marriage, as she admits, in March, 1938, but the other members of the family, especially the father and Ray Myers, the principal witness, state that they did not learn of the marriage until July. (They think it is important to avoid an estoppel to establish that they were ignorant of the marriage for a long time.) It is strange that the mother learning of the marriage in March said nothing of it to her husband and son Ray, who were in the home with her, and they did not learn of it until July, especially in view of her subsequent activities which demonstrate that she is a woman of curiosity and one who would not remain silent possessing intelligence of this character.

On April 28, 1938, a child, Mildred Myers, was born to this union, and the attending physician made out the required birth certificate in the name of the father and mother and answering "yes" to the question "Legitimate?" The child was born within five months of the wedding, and the birth certificate shows it was born at full term. Hugh's marriage to Blanche relieved him of any anxiety as to a criminal prosecution for a violation of the age of consent, since such offense is made a felony by statute. After the birth of this child, the young couple wanted to go to housekeeping and enter business, and they did so by opening up a restaurant in the suburbs of Sevierville and began housekeeping, having obtained a house in which to live.

By this time the marriage had become generally known, and Hugh Myers' parents furnished certain articles to furnish their home, and two bride showers were held for the wife, one by a neighbor and another by Hugh's grandmother; many presents were donated to the young couple by relatives, neighbors, and friends. They lived at this home and carried on this restaurant business for some time, and were visited by each of Hugh's parents who spent the night with him. (The parents will not admit this; they say they spent only a part of a night, the later part.) The grandmother taught the infant child, Mildred, to call her grandma and her husband grandpa, yet the family, in their testimony, insist that they never recognized this marriage, and the grandfather disclaimed any sentiment or affection for the child, Mildred, then or now, and reflect upon her parentage by expressing a doubt as to her fatherhood.

Finally, the couple broke up housekeeping and moved into the home of the parent, Bruce and Ida Myers, and while there the domestic relationship became disrupted, the wife not being able to get along with her in-laws. Her temper and demeanor were described as "throwing a fit," and she would take her baby and go to her home. It is apparent that her husband's mother formed a decided dislike for her, but the dislike was not shared by her husband who would go and get her. Hugh's father had a small house upon his land within a hundred yards of his home, and Hugh, assisted by his mother, fixed up this house and he and his wife moved into it. While living

there another child was born on the 24th day of July, 1939, and his birth certificate is in the record.

On August 10, 1938, Hugh Myers, the husband, took out a life insurance policy in the sum of $1,000 payable to Blanche Ogle Myers, his designated wife, as beneficiary. And prior thereto, on July 26, 1938, he had taken out an insurance policy in the sum of $1,000 payable to his infant daughter, Mildred Myers. He resumed his occupation of driving a truck, and provided to the best of his ability for his wife and children.

While he lived in the home of his parents with his wife and the wife was occasionally "throwing fits" as described by the father, his mother undertook to determine if her son was legally married. They state that Hugh told her that he was married in Maryville, so she wrote to the county court clerk in Maryville to determine if a marriage license had been issued, and receiving a reply that there was no record, she then proceeded to write the clerks of the surrounding counties. She states that Hugh came in one day and found her with a letter from a clerk and asked her to see it, but she declined, however, telling him that she was trying to determine if he was legally married, and she states that he replied, "I am." We have here the evidence of Ray that Hugh told his mother that he was married in Maryville, and the mother's testimony that he said that he was married. These inquiries were made one year before his death and thereafter the parents assisted him in preparing the house upon their land for his home where he lived until he was killed. After his death his parents wanted to take the oldest child, Mildred, discounting their testimony reflecting upon her legitimacy.

Hugh died on July 26, 1940, and the account of the accident and his death was carried in the daily papers, giving as surviving his widow and two children.

To recapitulate: The wife testifies that Hugh by prearrangement came and got her near her home and took her to Maryville, parking the car upon the street, when he and she went into the courthouse and into an office of a justice of the peace, the husband telling her that the officer was a justice of the peace. (This testimony was given without exception, if it were exceptionable, being a part of the transaction.) And that they were married by the justice of the peace, in the absence of witnesses, and returned to the car after being away about one hour. This occurred on the 22nd day of December, 1937, and they lived together as man and wife until July 26, 1940, when the husband died. The husband acknowledged her as his wife to his mother, and designated her as his wife in the insurance policy and to the doctor delivering the children, and he held himself out to the public as married. He never at any time did one act or said one word raising a suspicion or casting a doubt upon the performance of the ceremony as testified to by his wife. There is

direct proof of the performance of a ceremony and the consummation of a mariage, and this evidence raises a prima facie case of a legal marriage.

"The rule upon this subject is that, where a marriage has been regularly solemnized, the law will presume that it was valid, and will cast upon those asserting its invalidity the burden of showing the fact. . . . The burden is upon the person attacking the validity of such marriage to show that there was no such divorce. . . . the evidence should be cogent and convincing, since, in the interests of social order, the presumption in favor of the marriage is very strong, and the pressure of that presumption is felt at every stage of the inquiry. [Citing numerous authorities.]" Gamble v. Rucker, 124 Tenn., 415, 417, 137 S. W., 499.

The burden is upon the adversary to overcome the presumption. Whipple v. McKew, 166 Tenn., 31, 60 S. W. (2d), 1006. The parents attempt to overthrow this presumption by showing that no marriage license was issued by the clerk of Blount County where the marriage was performed on the designated day or any other day. They do this by introducing the county court clerk who testifies that he has examined his records and finds no evidence of the issuance of the marriage license to these named parties on this date or any other day before or after over a long period, and states that the licenses as issued are numbered consecutively. That he makes a record when the licenses are issued and another when they are returned by the official performing the ceremony, but he admits that it is possible for the clerk to neglect to make the entry when he issued the license; and that the officiating official neglects for as long as a year or longer in returning the license after performing the ceremony. He states that he took office on September 1, 1938, and was not the clerk who would have issued the license in December, 1937. The clerk whose duty it was to issue the license was not called. It is a known fact that county court clerks in some counties take blank marriage licenses to their homes in order not to have to go to the courthouse after night, and issue many licenses to couples away from the court house requiring the making of the entries upon the record at a later time, and if several blank licenses are removed from the book to be taken to the clerk's home, and he issues one and forgets it and makes no record of it, then it would not appear or break the sequence of the numerical order of those he recorded.

██ No attempt was made to call the clerk in office at the date of the license to show that he did not follow this practice, nor that he did not issue a license authorizing the marriage. This evidence is totally insufficient to overcome the presumption of a lawful marriage; and there is another presumption to overcome, for the officer who performed the ceremony is presumed to have done his duty. And the court will not by inference convict him of a diabolical fraud upon this girl by performing an illegal ceremony.

The courts hold in high favor this presumption of the legality of marriage. Where it is shown that a ceremony of marriage has been performed and at the time there was a prior marriage of one of the paties who was living with his former wife up until the time of the second marriage nevertheless there still is a presumption that there had been a legal divorce. Gamble v. Rucker, supra. Or if the ceremony shown and relied upon is held not to be a legal ceremony, then the courts will presume a subsequent legal marriage. Smith v. North Memphis Sav. Bank, 115 Tenn., 12, 89 S. W., 392.

"It would most certainly be an unreasonable rule to hold that, if no record of the issuing of the marriage license or return of the officiating clergyman could be procured, the marriage should be declared void. The conjugal relations are too sacred, and the institution of marriage, with its far-reaching results, too important to be disturbed by such fine technicalities. To hold to the contrary would make it possible to disrupt homes, destroy the happiness of families, cast odium upon children born in lawful wedlock, and disturb society. Marriage and its sanctity do not rest upon any such uncertain foundation." Franklin v. Lee, 30 Ind. App., 31, 62 N. E., 78, 82.

"The presumption of the validity of an alleged marriage shown in fact to have been entered into is not conclusive, but may be rebutted by evidence of invalidating facts. To overcome the presumption, however, the evidence must be strong, distinct, satisfactory, and conclusive; and if there is any evidence to support a finding in favor of the marriage, it will be sustained." Marriage, 38 C. J., sec. 116, p. 1344.

The evidence to overcome the presumption here is by no means conclusive or convincing. For the clerk in the office at the time who could have supplied the information, if it could have been supplied, was not called. In this case the presumption has not been overthrown and the prima facie case of a valid marriage prevails. It is held that Blanche Ogle Myers is the lawful widow of Hugh Myers, deceased, and entitled to all the rights growing out of the relationship.

Parenthetically, the testimony of Ray Myers raises an inference that it was impossible for his brother to have taken Blanche to the courthouse where the ceremony could have been performed and returned to the car within fifteen minutes, the time he claims to have been away at a coca-cola stand when his brother came after him. The parties traveled a long distance out of their way because Hugh wanted to go to Maryville on the way to Knoxville, and they didn't do this solely to enable Ray to drink a coca-cola. If Blanche had been testifying falsely she would have picked another occasion when Ray was not present. Ray claims not to have known about the ceremony until the July following, but he did not then tell Hugh that he was not married because he did not have time to get married while in Maryville, yet he does say that he told his mother that Hugh said he was

married in Maryville. During the family altercation the mother of Hugh would charge Blanche with not being married, when she would reply, "Prove it." This indicates even then that she was boldly confident in her position and did not fear an investigation. When to meet the presumption of a remarriage, she was asked if she was ever married again, she answered "No, you do not marry but once."

Her testimony being open and frank is corroborated by all the presumptions, and the declaration of her husband and consistent with all the proven facts, overcomes the unsupported testimony of the brother Ray who infers that they did not have time to perform the ceremony while in Maryville.

However, if the wife had failed to establish her status as a widow, nevertheless the children, by reason of the statute, Code, sec. 8453, are entitled to a decree of legitimacy under the proof. There was a ceremony performed, and a living together, and a holding out of a valid marriage, constituting a common law marriage which was void from the beginning either by reason of the failure to issue the license authorizing the marriage, or because of the fraud of the husband and the justice of the peace or purported official who performed the ceremony, and in either case the wife would be entitled to a decree of annulment under the divorce statutes. But it is not necessary for her to ask for a decree of annulment in order to legitimate her children for when she is entitled to the same the statute is effective. Deihl v. Jones, 170 Tenn., 217, 94 S. W. (2d), 47. This statute includes all marriages which are void from the beginning, and this is one falling in this classification. It cannot be reasonably said that this statute protects all children born in all other marriages void ab initio, and casts no benefit upon this one. So it follows these children are the legitimate children of Hugh Myers, and entitled to take his estate as his next of kin, or the proceeds derived from his wrongful death. But the court holds that the mother and children are the next of kin.

There is another defense relied upon, which is that the parents are estopped to bring in question the legality of the son's marriage, since he would have been estopped to question it. Smith v. North Memphis Sav. Bank, 115 Tenn., page 15, 89 S. W., 392. And that the parents stand in privity with the deceased husband. The parents deny that they stand in privity and are estopped, claiming the benefit of the statute, Code, sec. 8236, by reason of the enactment and not by distribution. This issue was raised in argument and is not supported by the brief, and the court being satisfied with the holdings above made feels it unnecessary to make an investigation to determine the privity of the parents and the deceased son, in this character of case.

The decree of the lower court is reversed, and a decree will be entered here in conformity with this opinion, authorizing the payment

of the funds in question to the widow and children as next of kin. The cost of the appeal is taxed against the appellees. The fees as taxed below will be paid as there ordered.

Ailor and McAmis, JJ., concur.