Mrs. Lilla A. Payne *v.* Mrs. Icedora K. Payne.

(*Nashville.* December Term, 1919.)

1. MARRIAGE. Rule that there must be search of records to overcome presumption of divorce applies only to State of party's residence.

The rule that a general search must be made of the court records for divorce in order to overcome the presumption indulged in favor of the legality of a second marriage has reference to the court records of the State in which the spouse effecting the second marriage has established a residence, so where a man, resident of Tennessee celebrated a second marriage in Arkansas, stating at the time he was a resident of the State of Ohio, the court records of States other than Tennessee need not be searched to rebut the presumption that there was a divorce. (*Post, pp.* 330, 331.)

2. MARRIAGE. Presumption favor of legality of second marriage that there was a divorce can be overcome by proof.

The presumption in favor of the legality of a second marriage that the person celebrating the marriage has obtained a divorce is one of fact, and may be rebutted by proof. (*Post, pp.* 331-333.)

3. MARRIAGE. Presumptions of divorce in favor of legality of second marriage are not indulged in on behalf of the parties.

The presumption of divorce in favor of the legality of a second marriage is not for the benefit of the parties, or intended to allow the bigamous wife or bigamous husband to prevail over a legal spouse, or a legal marriage. (*Post, pp.* 331-333.)

4. MARRIAGE. Second marriage held invalid; the husband not having obtained a prior divorce.

In a contest between two women, each of whom claim to be the legal widow of decedent, *held* that, despite the presumption in favor of the legality of the second marriage, the evidence showed that

there was no divorce, and that the second marriage was a biga-mous one with Code 1858, section 4839. (*Post, pp.* 331-333.)

Cases cited and approved: Gamble v. Rucker, 124 Tenn., 415; Smith v. Bank, 115 Tenn., 12; Johnson v. Johnson, 41 Tenn., 630. Code cited and construed: Sec. 4839 (1858).

5. **MARRIAGE.** There is no estoppel between two women, each of whom claims to be the legal wife of decedent.

Where a man who had long been married celebrated a second mar-riage without the knowledge of his first wife, and when she dis-covered his relations with the other woman informed her that there was no marriage, *held* that under the circumstances there was no estoppel between the parties. (*Post, p.* 333.)

Cases cited and approved: Sloan v. West, 50 Wash., 86; Heisen v. Heisen, 145 Ill., 658.

---

### FROM HAMILTON.

---

Appeal from the Circuit Court of Hamilton County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. NATHAN L. BACHMAN, Judge.

J. M. TRIMBLE, and PERCY H. CHANDLER, for Mrs. Icedora K. Payne.

C. W. K. MEACHAM, for Mrs. Lilla A. Payne, Adm'x.

MR. CHIEF JUSTICE LANSDEN delivered the opinion of the Court.

The following statement of the case is taken from the opinion of the court of civil appeals, which all parties agree is correct:

21.—142 Tenn.

"This case involves a contest between two claimants of the right to administer the estate of Simpson P. Payne, who died intestate in Shelby county, Tenn., on the 31st of October, 1917. Each of the contestants claims to be the lawful widow of said S. P. Payne, deceased.

"On November 23, 1917, Mrs. Lilla A. Payne, a resident of Hamilton county, Tenn., applied for and obtained letters of administration on said estate from the county court of Hamilton county, and duly qualified as such administratrix. On February 6, 1918, Mrs. Icedora K. Payne, a resident of Maury county, Tenn., filed a petition in the county court of Hamilton county, alleging that she is the lawful widow of said S. P. Payne, deceased; that the home and place of residence of said decedent was in Maury county, Tenn., and not in Hamilton county; that said Mrs. Lilla A. Payne, to whom letters of administration had been issued, was neither widow, relative, nor creditor of said decedent, and therefore had no right to administer upon his estate. The petitioner prayed that Mrs. Lilla A. Payne be made a defendant to said petition, and be required to appear and make defense to same; that the letters of administration granted to Mrs. Lilla A. Payne be revoked, recalled, and canceled, and that petitioner be left in position to be appointed and qualified as administratrix by the county court of Maury county, Tenn., the place of residence of the deceased, S. P. Payne, or, should the court determine that the said S. P. Payne, deceased, did have a place of residence in Hamilton county; that petitioner be appointed the administratrix of her said deceased husband's estate.

"On February 28, 1918, Mrs. Lilla A. Payne filed an answer to said petition, in which she denied that petitioner is the lawful widow of S. P. Payne, deceased, and averred that she (Mrs. Lilla A. Payne) is the lawful widow of said decedent. She denied that said decedent was a resident of Maury county, Tenn., at the time of his death, and averred that at that time his legal residence was in Hamilton county, Tenn. Mrs. Lilla A. Payne also alleged in her answer that she is a creditor of the estate of S. P. Payne, deceased, in the sum of $1,000, evidenced by promissory note executed by deceased December 10, 1912, which note is outstanding and unpaid.

"The cause was heard before the judge of the county court upon the petition, answer, and proof, upon which the court found that the letters of administration to Mrs. Lilla A. Payne were not improvidently granted, and that the petition and proof did not show proper cause for revocation, and the court dismissed the petition of Mrs. Icedora K. Payne, and taxed her and the sureties on her cost bond with all the costs of the proceeding. Mrs. Icedora K. Payne prayed, was granted, and perfected an appeal to the circuit court of Hamilton county, where the cause was heard upon the transcript from the county court and proof introduced upon the trial, whereupon the circuit court found that the letters of administration issued to Mrs. Lilla A. Payne by the county court 'were improvidently issued under the erroneous assumption that said defendant was the legal widow of the intestate when in fact she was not the legal widow.'

"We shall designate Mrs. Lilla A. Payne as appellant and Mrs. Icedora K. Payne as appellee.

"It is admitted on the record that the appellee Mrs. Icedora K. Payne holds a certified copy of marriage li-- cense issued by the county court, clerk of Maury county, Tenn., on the 8th day of December, 1875, upon which the return is made by J. W. Howard as the officiating minis- ter, showing that Icedora K. Payne (then Icedora Math- ews) was married to the deceased, S. P. Payne, on the 9th day of December, 1875, and that she also holds a certified copy from the marriage license book of Maury county, Tenn., showing the proper indorsement and re- turn of said license.

'It is also admitted on the record that Mrs. Lilla A. Payne holds a certified copy of license from Pulaski county, State of Arkansas, showing that on the 26th day of May, 1910, she was married to S. P. Payne of Cincinnati, marriage taking place in Pulaski county, Ark., certificate of the marriage is signed by Henry M. Hyde, rector of Christ Church of Pulaski county, Ark., and these certificates are all authenticated by the clerk of the county and probate court of said county of Ar- kansas under his seal, and the authority of said county and probate clerk is attested by Joseph Asbury, county and probate judge of Pulaski county, Ark., and the county court clerk attests to the authority, etc., of the county judge.

"It is also admitted on the record that the S. P. Payne referred to in both of the marriage certificates as above stated is one and the same person, and that he is dead; that he died in Memphis, Tenn, October 31, 1917."

As a result of the marriage of appellee and S. P. Payne a daughter was born, who is married and has a

family of her own. No children resulted from Payne's marriage with the appellant.

The appellee states: That she and Payne lived in Columbia, Tenn., from the time of her marriage with Payne, in 1875 until about 1915, when she moved to Mt. Pleasant, Tenn., to reside with her daughter. Payne was a model husband to her for a long time, but business troubles overtook him, and he failed in business. After that time he became a traveling salesman, and traveled over the States of Texas, Oklahoma, and South Carolina, and perhaps other States. He would be absent four, five or six weeks, and sometimes for a year. That she never know of Payne residing in Ohio. That he had not given her much in the way of support for the last 15 years, and that during the last 4 years she contributed to his support. She sent him as much as $150 at a time during the last 4 years. Payne corresponded with her, and when he came home they lived together as man and wife. In February, 1915, Payne telegraphed appellee that he was sick and in a bad condition and wanted $200. At appellee's request her daughter, Mrs. Davis, and a sister of Payne went to Richmond, Ky., where he was, and found that he was living with appellant. This trip was made at appellee's expense, and when her daughter returned she reported this fact to appellee. The appellant told Mrs. Davis that she and Payne were married, and this was the first time that appellee ever heard of the second marriage. Payne wrote to the appellee after this occurrence, and denied that he was married to appellant, and begged appellee to forgive him, and said that he desired to come back

to her. This letter was sent by the appellee to the appellant, and later in the same year Payne came to Mt. Pleasant and spent the summer with appellee, and they lived together as husband and wife, and Payne repeated his statement to appellee that he was not married to appellant. Payne returned to the road as a traveling salesman at the end of the summer, and appellee did not see him again until his death, which occurred about two years later; but that Payne continued to communicate with appellee on up until the time of his death, and he wrote to her under date of October 23d before his death on the 31st of the same month. The appellee says that she answered some of Payne's letters during the two years intervening between the departure from Mt. Pleasant and his death. She says that she never filed a bill for divorce against Payne, and that she never heard of Payne filing a bill against her; that a divorce had never been spoken of between them, and that there had never been a separation between them any further than that Payne, in the pursuit of his business as a traveling salesman, would go away from home a great deal of his time. Her viewpoint is well set forth in a letter which she wrote to solicitors for appellant, who wrote Mrs. Davis and inquired if there was a divorce between appellee and Payne. The letter is as follows:

"Mt. Pleasant, Tenn.

"Estill & Norman, Chattanooga, Tenn.—Gentlemen: After the hustle and worry of getting ready for the holidays, and the little stockings have been filled, I have gotten to your letter at last, written to my daughter, which I will answer myself. First I will say there is no

divorce, nor was there ever one spoken of. I professed to be a Christian and believe what God has joined together let no man or woman put asunder. I married him some years ago and took him for better or worse and I am sorry to say that worse has prevailed. Mr. Payne for years was an ideal husband, and when misfortune over took him, he failed in business in Columbia where we have so many warm friends; he then accepted a position as a traveling salesman. There he did well, was true to his family, but at last the evil one tempted him, and he fell as so many good men do. Woman had been his ruin—not one but many— and my life has been wrecked, and that woman did it. But if the prayers of a heartbroken wife and daughter ever reached high heaven, ours have and will in his behalf. As I have said he is my husband and as such will remain until death.

Respectfully,                    MRS. S. P. PAYNE."

Appellant and Payne were married in 1910, and have lived together most of the time since then. The appellant was a teacher for many years in schools of high reputation, and was teaching when she was married to Payne. She says Payne told her that he was a widower, but before they were married he explained that his wife was not dead, but that he and she were divorced, and had been for more than three years; she says she "took his word for it." She admits that she made no further investigations of Payne's alleged widowerhood.

She remembered the trip made to Kentucky by Payne's sister and Mrs. Davis. She and Payne were living together at that time, and she says that neither of the visiting ladies made any intimation that she was not the

legal wife of Payne. She says the first intimation that she had that Payne was not divorced from his first wife was in February, 1916, when Mrs. Davis wrote a sarcastic letter to Payne in reply to Payne's request for financial assistance. and implied that appellant was not legally married to Payne; but that when she spoke to Payne about what Mrs. Davis had said in her letter Payne replied that Mrs. Davis was only trying to separate them and make appellant jealous, and he continued to deny that he was not divorced until the time of his death. We make the following extract from appellant's cross-examination.

"Q. Did Mr. Payne tell you anything about where he had lived, etc? A. Not at all, he was a man not given to going into anything unpleasant; he said life was hard enough without thinking of unpleasant things, that I had confidence in him and had no reason to be suspicious of him. I am not of a suspicious nature. Q. You did not question him about his past life, or where he had lived or anything of that kind? A. He told me that he had lived in Columbia, Tenn., and he mentioned Columbia very frequently, and said that he had a daughter there, Mrs. Davis. Q. Did he tell you at that time that Columbia was his home? A. No, he never called it his home, but said he had lived there. What did he call home? A. I don't know; he was a traveling man, and I don't know whether traveling men call any place home if they have no wife to go to. Q. Did he tell you where his divorced wife was living? A. No, sir; we never discussed her."

There are letters in the transcript which appellant wrote to Payne in his lifetime, and they demonstrate that appellant was very much concerned about certain policies of insurance on the life of Payne, and which were held by his daughter, Mrs. Davis. She stated to him in these letters with great emphasis and repetition that she was through with him and would have nothing further to do with him, unless he procured the policies from Mrs. Davis and delivered them to appellant. She stated in these letters that she would tell everything to the insurance company, unless he procured them from the daughter, and delivered them to her. She also made threats in the letters against appellee and her daughter. One of the letters contains the following language:

"Tell me do you intend to let them do you that way? I can do this, I can and will write the company that I was not your legal wife and the policies were taken out under fraud, that will make them cancel them and they will do it too. I give you fair warning if you do not get those policies from your daughter and have them changed that I will have them cancelled by telling the company the truth of the situation. By your own statement there is no record of your divorce. That woman says you are not. I have her letter, also much else that can be used as evidence against the whole bunch. I have stood for all I can or will in mistreatment from you and your people."

She was asked on recross-examination what she meant by this particular part of the letter. The questions and answers are as follows:

"Q. What did you mean in these letters that you would expose in the court? A. I don't suppose that I ever read those letters over after I wrote them; they were written in the heat of passion like a woman will when she had her feelings hurt or feels that she is not being treated just exactly right. Q. What prompted you to write those letters saying that you would expose the whole push in court, making threats like that? A. Because he told me that he had some rights in that property at Columbia, and he needed help, and they were not helping him. I was Mr. Payne's wife, and they were saying that I was not his wife. Q. Didn't you know that if Mr. Payne had not been divorced from his wife, and she was living, he was a bigamist, and subject to criminal prosecution? A. Yes, sir; but he said that he was divorced. Q. But you knew that if this was not true that he was a criminal under the State laws of Tennessee? A. Yes, sir; but he said he could prove that he was. Q. Then you were not making a threat to expose this fact, and have it investigated? A. No, sir; I was not doing it with that intention. Q. What were you doing it for then? A. Trying to get Mr. Payne to take some action, so he would have something to live on. I felt sorry for him. I thought if I would be as vehement about it as I could that he might get busy and do something about it. That is all. I felt sorry for him, and wanted him to protect himself."

We have set out rather fully the testimony, in the case in order to show the point of view entertained by each party. We think it is beyond dispute that the appellee had demonstrated to the satisfaction of any

reasonable mind that she was a good, patient, and forgiving wife, and that she always administered to the necessities of Payne as occasion required.   The letter quoted, when there .was no motive to speak falsely, demonstrates that she knew of the shortcomings of her husband, but that through Christian belief she would not seek or have a divorce.   She says that she did not give Payne any reason for divorce, and therefore he could not have procured one except by perjury and subornation of perjury.

The case with the appellant is different.   She made no inquiry before her wedding with Payne, except to ask him about his first wife.   Her testimony shows that she knew of the illegality of her marriage to Payne long' before his death.   Her correspondence with him shows a perfect aversion for him and a great solicitude for the insurance policies possessed by his daughter.   There was no search made of court records in Tennessee for record of a divorce between appellee and Payne.

We agree with the court of civil appeals that the facts stated show conclusively that there was no divorce. The rule laid down by the authorities to the effect that a general search must be made of the court records for divorce, in order to overcome the presumption indulged in favor of the legality of the second marriage has reference to the court records of the State in which the spouse effecting the second marriage has established a residence.   The court of appeals finds as a fact to which there is no exception that Payne did not establish a domicile in Ohio.   We do not think he had a domicile in any other State than Tennessee.   Under the rule stated

the appellant would not be required to search the court records of other States.

The courts have created presumptions in favor of divorce from the first marriage where there has been a second marriage, of the continuity of a marriage where such presumption is necessary to preserve the integrity of the family and the legitimacy of children, and has presumed the validity of the first marriage for the same reasons. All these presumptions have arisen from the concern of the law for the legitimacy of children, for the integrity of the family, and for the capacity of inheritance. These are all questions in which the public is interested, and this concern is felt at every stage of the inquiry. *Gamble* v. *Rucker*, 124 Tenn., 415, 137 S. W., 499; *Smith* v. *Bank*, 115 Tenn., 12, 89 S. W., 392; *Johnson* v. *Johnson*, 1 Cold., 630. Many cases upon the subject are referred to in 16 L. R. A. (N. S.), 98, in the footnotes to *Smith* v. *Fuller*. These cases show the state of the law throughout the country, and there is no case which is contrary to the principles above stated.

The question we have is whether the presumption that a divorce from the first marriage was granted will obtain, because a search of the court records has not been made. This presumption is a strong one and is indulged whenever it is necessary to attain the ends of justice. But it is a presumption of fact, and can be overcome by proof. Such proof may fall short of investigation of the court records. It is shown that Payne continued to live with appellee as her husband except when he was away, so far as she knew, on his regular business. They corresponded as husband and wife, and

she assisted him financially as his wife, and at his request as her husband, on different occasions.  More than all else she gave him no just cause for a divorce, and shows that she did not believe in divorce.  Under these facts we must conclude that there was no divorce.

That presumption is indulged to promote the things in which the public has an interest, and is not indulged on behalf of the parties themselves, is well illustrated by the cases of *Smith* v. *Bank,* supra, and the case of *Gamble* v. *Rucker,* supra.  In *Smith* v. *Bank,* there was no other claimant of the estate except the widow, and in *Gamble* v. *Rucker,* children from two marriages were admitted into heirship, although the opinion shows that the first wife was living and present at the second marriage.  The court presumed a divorce, and that both marriages were legal.  The outside authority is to the same effect.

The presumption was not intended to be created in order to allow the bigamous wife or a bigamous husband to prevail over the legal wife or a legal marriage, when the result of such presumption would benefit only the bigamous wife.  Looking at the evidence alone, and in the absence of a presumption that there was a divorce, the second marriage was plainly bigamous, and Payne could have been convicted of bigamy.  Code 1858, section 4839.  Appellant lived and cohabited with Payne after she knew that there was no divorce and that there was a living wife.  While Payne was living with her he applied to appellee for financial assistance, with appellant's knowledge, which, if granted, would benefit directly the appellant.  After this, and after she was informed that

she was not Payne's legal wife, she continued to live with him and assert her rights as his alleged wife.

There is no estoppel between the parties. *Sloan* v. *West,* 50 Wash., 86, 96 Pac., 684, 17 L. R. A. (N. S.), 960; *Heisen* v. *Heisen,* 145 Ill. 658, 34 N. E., 587, 21 L. R. A., 434. This must be true because the estoppel, if it existed, would be at large, and such an estoppel is no estoppel at all.

We think the appellee is the legal widow of the deceased and as such is entitled to a judgment in her favor.

Justice Bachman tried this case as circuit judge, and did not participate in the consideration or determination of the case in this court.