## MADEWELL v. UNITED STATES et al.

### Civ. A. No. 1061.

United States District Court
E. D. Tennessee, N. D.

Feb. 1, 1949.

---

Jennings, O'Neil & Jarvis, Knoxville, Tennessee, Elmer L. Eblen, Kingston, Tennessee, for plaintiff.

J. B. Frazier, Jr., United States Attorney, Chattanooga, Tennessee, Ferdinand Powell, Jr., Assistant United States Attorney, Knoxville, Tennessee, and O. T. Ault, successor to J. B. Frazier, Jr., Chattanooga, Tennessee, for defendant United States of America.

Langford & McKay, Cookeville, Tennessee, for defendant Maude Madewell.

**TAYLOR, Chief Judge.**

Suit was commenced by plaintiff, Mary Jean Madewell, to recover benefits under a National Service Life Insurance certificate issued to Orville O. Madewell, in which plaintiff is designated as the wife of the insured and named as his beneficiary. The Veterans Administration has disallowed her claim for benefits on the ground that she is not the legal widow of the insured. There is no material controversy here as to the relevant facts. Copies of certain California court records were admitted in evidence subject to plaintiff's objections as to their admissibility. In the Court's view of the case, their admission does not prejudice plaintiff's position. Otherwise the Court would be disposed to exclude them as being inadmissible.

Orville O. Madewell entered military service July 13, 1943, was discharged therefrom August 10, 1944, and died December 29, 1945. For sometime prior to his discharge he was confined to hospitals as a tuberculosis patient. Before his death, plaintiff received benefit payments from Veterans Administration as the wife of Orville O. Madewell. After his death payments to her were discontinued, although certain payments to her children have been continued. What prompted the Veterans Administration to inquire into the validity of her marriage is not entirely clear. Neither the plaintiff nor the defendant Maude Madewell, mother of the insured, knew of any question as to the validity of the marriage until they were informed by the Veterans Administration that plaintiff was not Orville O. Madewell's widow.

Through its investigation, which seems to have been quite thorough in respect to proving invalidity of the marriage, the Veterans Administration learned that plaintiff and the insured went through a formal marriage ceremony in Rossville, Georgia, March 21, 1942. At this time the insured had a wife against whom divorce proceedings were pending in California. The interlocutory decree in the suit was not entered until June 19, 1942, and it was not until September 16, 1943, that the final decree of divorce was entered in that state. Other information obtained by the Veterans Administration, most of it furnished by the plaintiff at the request of the Administration—furnished by her in utmost good faith and without any suspicion that it might be used to affect her rights adversely —tended to show that her ceremonial marriage to the insured, invalid at the time it was entered into, continued invalid until his death.

Following the ceremony at Rossville, the couple returned to Tennessee, where they resided for several months, part of the time in the home of her father, part of the time in the home of his father. Plaintiff knew the insured had been married before, but she believed he had been divorced. There is evidence that he entertained a similar belief. She clearly had no doubts on the point. They cohabited as husband and wife and were accepted as such in the communities where they resided. Two children were born to them as a result of their union. They also lived together for a short time in the State of Ohio, but under what conditions is not apparent. There was an estrangement between them a few months before his death, but no divorce proceedings were commenced by either of them. So far as is known, they continued to regard themselves as husband and wife even during the short period of their estrangement.

In this situation there existed sufficient basis for a valid common law marriage. But the Veterans Administration, finding as a matter of law that Tennessee does not recognize common law marriages, ruled that plaintiff and the insured never became husband and wife and that she, therefore, is not his legal widow. Her claim for insurance benefits was rejected, and she was informed of the reason for the rejection. The Board of Veterans Appeals likewise rejected her claim on the same ground, namely, that she was not the legal widow of the veteran. The solicitor for Veterans Administration, on the showing heretofore set out, ruled that their purported marriage at Rossville, Georgia was bigamous, that Tennessee does not recognize common law marriages, and that the marriage never ripened into a common law

marriage.. In addition to denying plaintiff the benefits of the veteran's insurance, the action of the Veterans Administration in effect pronounces that the two small children here concerned had a father who died a bigamist, that they themselves are bastards, and that their mother is an adulteress. As will appear hereinafter, by pressing its inquiry only a little farther the Veterans Administration could, without difficulty, have reached the opposite decision.

The public policy of Tennessee and, this Court believes, the public policy of the civilized world, is to sustain marriages, not to upset them. For over a hundred years the public policy of Tennessee has denied to third parties the privilege of inquiring into the validity of the marriages of her citizens. Even those who come within the circle of permissible interest are narrowly restricted in the manner and range of their inquiries. Over and over have the courts of this State declared that those who must inquire, shall not deal carelessly with other people's lives, particularly the lives of innocent children. That Tennessee does not recognize common law marriages is a statement often used, but loosely, and with little support. Over a century ago it was stated by the State's Supreme Court that compliance with statutory preliminaries, as well as the ceremonials of marriage, is mandatory, yet it must be apparent, that wherever statutory requirements are as numerous and complicated as they have come to be in some of our states in recent times, perfect compliance with them may be regarded as the exception rather than the rule. If compliance is mandatory in every particular, and if inquiry into the validity of marriages is to be indulged on any and every pretext, there is a wide-open field for the introduction of social chaos. Tennessee has taken a strong stand against unnecessary inquiry. We have only to examine a few cases in order to see how difficult it is in this State to overthrow a marriage on any pretext.

The somewhat anomalous position taken by Tennessee courts on the subject of common law marriages is traceable to the old case of Bashaw v. State, 1829, 9 Tenn. 177. That case was a prosecution for bigamy, the judgment of guilty being reversed by the Supreme Court. Twenty-two years after voluntary dissolution of a common law union, Bashaw had entered into a formal marriage with another woman. The opinion of the court declared that a marriage, to be valid, must be according to the marriage laws, and that "the common law is wholly superseded on the same subject by them." The dissenting opinion of Justice Peck contained the following: "The form pursued should not be critically examined to defeat the marriage, but would (should?) be taken liberally, to support it. The tender and most endearing ties of our nature demand it should be so. If the common law is not repealed by the act, then there is no question the (first) marriage is good to every intent. Vows were publicly made, witnesses were called, and acts in after-life had proved, until after the birth of children, that both were sincere. All this evidence must stand together; it all speaks the assent of the will and consummation of the nuptials. The rights of the innocent offspring speak in such a case; and their rights, as well as the rights of offended society, must be heard."

In subsequent cases the Supreme Court of Tennessee, paradoxically, has adopted both of the views expressed in the Bashaw case. That court later declared that observance of statutory requirements is mandatory and wholly supersedes common law marriage. Smith v. North Memphis Savings Bank, 1905, 115 Tenn. 12, 89 S.W. 392. Yet where there is a subsisting marriage, whether the result of common law or ceremonial union, the policy is to sustain it, as against the assertion of an undissolved prior marriage. Cole v. Parton, 1937, 172 Tenn. 8, 108. S. W.2d 884; Hale v. State, 1942, 179 Tenn. 201, 164 S.W.2d 822; Perry v. Sun Coal Co., 1945, 183. Tenn. 141, 191 S.W.2d 181. Within five years from the decision in Bashaw v. State, the same court began a series of restrictions upon the majority opinion of the Bashaw case. In Ewell v. State, 1834, 14 Tenn. 364, 27 Am.Dec. 480, where defendant was charged with incestuous intercourse with his niece, it was held that proof of formal marriage of the girl's parents was not necessary to a

conviction, proof by reputation being sufficient. From this has originated the rule that a defendant may not attack a common law marriage in order to escape the consequences of a crime. McReynolds v. State, 1867, 45 Tenn. 18; Hale v. State, 1942, 179 Tenn. 201, 164 S.W.2d 822. There is also the rule that a party to a common law marriage may not attack it as a means of promoting self-interest. Johnson v. Johnson, 1860, 41 Tenn. 626; Smith v. North Memphis Savings Bank, 1905, 115 Tenn. 12, 89 S.W. 392. Nor may a marriage, whether of common law or statutory form, be attacked by third parties in self-interest. McKinney v. Clarke, 1852, 32 Tenn. 321, 58 Am.Dec. 59; Rogers v. Park's Lessees, 1844, 23 Tenn. 480; Bohlen-Huse Coal & Ice Co. v. McDaniel, 1923, 148 Tenn. 628, 257 S.W. 848; Brewer v. Griggs, 1929, 10 Tenn.App. 378, certiorari denied December 21, 1929; Cole v. Parton, 1937, 172 Tenn. 8, 108 S.W.2d 884.

As to what the result is, where a marriage ab initio is invalid or defective because of some impediment then existing and that impediment later disappears, has been indicated only in certain situations. Does continued cohabitation after removal of the impediment amount to ratification? It was so held as to emancipated slaves in McReynolds v. State, 1867, 45 Tenn. 18, where it was suggested, also, that the same result would follow where under-age parties continued to cohabit after coming of age. In Willard v. Willard, 1873, 65 Tenn. 297, 32 Am.Rep. 529, the court said: "Marriage is so far an ordinary civil contract, that its basis is the mutual consent of the parties." The holding there was that coercion into matrimony was ground for annulment, and there was no indication of what would have been the result had the coerced party afterwards voluntarily cohabited with the other party. But in Cole v. Cole, 1857, 37 Tenn. 57, 70 Am.Dec. 275, the court held that a person who entered into matrimony while insane was deemed to have ratified the marriage by continuing to cohabit after the insanity had disappeared. The court said: "A lunatic, on regaining his reason, may affirm a marriage celebrated while he was insane * * * and this without any new solemnization." 37 Tenn. 57, 63, 70 Am.Dec. 275.

Where there has been a marriage ceremony, insufficient to constitute a valid statutory marriage ab initio, the parties thereto nevertheless acquire the rights and incur the liabilities of married persons with respect to each other. Allen v. Allen, 1928, 8 Tenn.App. 48; Johnson v. Johnson, 1860, 41 Tenn. 626.

In addition to rules of exclusion, the courts of Tennessee have raised certain presumptions in support of the validity of a marriage. Where a man and a woman have been formally married and have lived together as husband and wife for many years, there is a presumption that the marriage was valid. Cole v. Parton, 1937, 172 Tenn. 8, 108 S.W.2d 884. In that case the court said: "Certainly it was never contemplated by the Legislature that thirty years after a marriage, the birth of children, the acquisition of property, and the death of parties and witnesses, interested parties could attack that marriage, have it declared void, and the issue thereof decreed illegitimate. Such an interpretation would likely subject many marriages to corrupt and fraudulent attacks by unscrupulous and designing persons, and would tend to make the legal status of marriage uncertain, while the policy of the law is to protect marriage with every presumption of legality." 172 Tenn. 11, 108 S.W.2d at page 885.

Again, where a person marries a second time while the former spouse is living, there is a presumption of valid divorce from the former spouse. Payne v. Payne, 1919, 142 Tenn. 320, 219 S.W. 4; Gamble v. Rucker, 1911, 124 Tenn. 415, 137 S.W. 499; Johnson v. Johnson, 1860, 41 Tenn. 626; Rogers v. Park's Lessees, 1844, 23 Tenn. 480. In Gamble v. Rucker the court said: "The rule upon this subject is that, where a marriage has been regularly solemnized, the law will presume that it was valid, and will cast upon those asserting its invalidity the burden of showing the fact. This is true when it is asserted against such marriage that it was entered into pending a valid prior mar-

riage. If the former spouse be living, the law, in cases involving the settlement of property rights, will presume that one or the other party to the former marriage had procured a divorce before the second marriage was entered into. The burden is upon the person attacking the validity of such marriage to show that there was no such divorce. This may be shown, and generally should be shown, by evidence that the records of the courts had been searched where such divorce decree or judgment should be found, if in existence at all, and that they show no such entry. The fact may also be shown by other direct evidence, and by circumstances; but the evidence should be cogent and convincing, since, in the interest of social order, the presumption in favor of the marriage is very strong, and the pressure of that presumption is felt at every stage of the inquiry." 124 Tenn. 415, 417, 137 S.W. 499. And in Payne v. Payne, supra, the court said: "All these presumptions have arisen from the concern of the law for the legitimacy of children, for the integrity of the family, and for the capacity of inheritance." 142 Tenn. 320, 332, 219 S.W. 4, 7.

There is one other case which indicates clearly the recent trend of the Supreme Court of Tennessee with respect to common law marriages. Although the case arose under the Workmen's Compensation Law, it is of great persuasive authority here. In that case an employee, Otis Perry, was killed. Otis had first married Flossie, from whom he soon separated without benefit of divorce. He next married Ida, who died, leaving Donald as their child. Otis then married Gladys, who, upon learning that Otis had not been divorced from Flossie, importuned him to procure a divorce, which he did. But he and Gladys did not thereafter go through a second marriage ceremony, neither thinking it necessary. They continued to live together in Tennessee as husband and wife, being accepted as such in their community. The trial court held that the marriage of Gladys was bigamous and denied her compensation benefits as the widow of Otis. This decision was reversed by the Supreme Court of Tennessee, mainly on

the ground that dependency rather than blood or marriage was the true basis of the right to compensation benefits. But the court said: "We do not think the fact that she did not remarry Otis Perry after the divorce was granted precludes her right to recover compensation as a dependent. She was recognized by deceased as his lawful wife; she was dependent upon him for support. The mere fact that his marriage was technically bigamous cannot be interposed as a defense in this case. Her relationship with the deceased from the time the divorce was granted until his death was that of a lawful wife. It was not necessary that they should procure a second marriage license and formally remarry in order to constitute her a lawful dependent under our compensation statute." Perry v. Sun Coal Co., 1945, 183 Tenn. 141, 146, 191 S.W.2d 181, 183. The court then added significantly: "In Chamberlain v. Chamberlain, 68 N.J.Eq. 736, 62 A. 680, 3 L.R.A.,N.S., 244, 111 Am. St.Rep. 658, 6 Ann.Cas. 483, it was held: 'When a man and a woman intend to marry and live together as husband and wife, but their intent is frustrated by the existence of some unknown impediment, when the impediment is removed and it is shown that the same intent continues, their relations are lawful.'

"The annotator (c Ann.Cas. 483) cites our own case of Cole v. Cole, 37 Tenn. 57, 70 Am.Dec. 275, in which it was held that the marriage of a lunatic, though void at the time, becomes valid by cohabitation after the mind is restored; referring to 1 Bishop on Marriage and Divorce, 142, as authority. See also Warwick v. Cooper, 37 Tenn. 659." 183 Tenn. 141, 146, 191 S.W.2d 181, 183.

The court in the Perry case did not find it necessary to hold that the marriage in that case had been cured of its bigamous character by dissolution of the prior marriage and continued cohabitation of the parties under the second, but the conclusion seems inescapable that had the issue been directly presented the court would have so held. In the earlier compensation case of Bohlen-Huse Coal & Ice Co. v. McDaniel, 1923, 148 Tenn. 628, 257 S.W. 848, 849, the employer defended against

compensation liability on the grounds that the parents of the deceased employee were never married, that the deceased was illegitimate, and that the father was not entitled to benefits. There the court said: "We conclude, therefore, that upon our authorities and the facts of this case the plaintiff in error cannot be permitted to deny that a valid marriage subsisted between Mose McDaniel and the mother of the deceased, in this case where the question is purely incidental."

■ By reference to cases cited herein, it should be apparent that as to Mary Jean Madewell's marriage to Orville O. Madewell, there existed all of the enumerated presumptions in favor of its validity, also that the Veterans Administration, in marshaling evidence in opposition to the presumptions, was indulging in an unsolicited and unwarranted gratuity. Viewed even in that light, the evidence is inadequate. It did not include any investigation of Tennessee records as to divorce or subsequent corrective marriage. Instead, it invited the unsuspecting widow to furnish evidence against herself, which she did in complete innocence and utmost confidence and good faith.

■ Moreover, the Veterans Administration held in its own official file information which should have led it to the discovery of evidence of the highest importance in favor of the insured's widow. That record showed that the insured during his military service was stationed for several months at Ft. McClellan, Alabama, a state in which common law marriages are expressly recognized and sustained by numerous court decisions. Murphy v. Jacobs, 1947, 249 Ala. 594, 32 So.2d 306; Campbell v. Rice, 1944, 245 Ala. 395, 17 So.2d 162; Cavin v. Cavin, 1939, 237 Ala. 185, 185 So. 741; Rogers v. McLeskey, 225 Ala. 148, 142 So. 526. At the hearing of the case before this Court it was proved that plaintiff and her first child visited the insured while he was stationed in Alabama, that they lived together off the reservation at different times for a number of days and nights in a home where they had an apartment, that plaintiff and the insured cohabited with each other, declared themselves to be wife and husband and were so received and accepted by the owners of the home and by friends of the insured. And all this occurred after the divorce decree in California had become final. Had there been any question as to the legality of their relationship as husband and wife, the relationship became established, so far as Alabama was concerned, as a legal and valid common law marriage.

■■ The marriage, having been consummated as a common law marriage in Alabama, became a valid and subsisting marriage also as to all other states and so continued until the insured's death. Morgan v. McGhee, 1844, 24 Tenn. 13; Pennegar v. State, 1889, 87 Tenn. 244, 10 S.W. 305, 2 L.R.A. 703, 10 Am.St.Rep. 648; Keith v. Pack, 1945, 182 Tenn. 420, 187 S.W.2d 618, 159 A.L.R. 101; Smith v. Mitchell, 1947, 185 Tenn. 57, 202 S.W.2d 979. In Pennegar v. State the court stated the general rule to be that, unless some positive statute or pronounced public policy of the particular state demands otherwise, "a marriage, valid where solemnized, is valid everywhere." Tennessee has placed two situations within the exceptions to the general rule. One is where the out-of-state marriage contravenes Tennessee's statute against marriage to the correspondent by a party divorced for adultery. Pennegar v. State, supra. The other is where parties, though validly married in another state, could not lawfully have been married in Tennessee because of this state's miscegnation statute. State v. Bell, 1872, 66 Tenn. 9, 32 Am.Rep. 549. Although the question of the legitimacy of plaintiff's children is not before the Court, the case of Smith v. Mitchell, 185 Tenn. 57, 202 S.W.2d 979, is significant. In that case children were born to an unmarried mother in Alabama. Later the mother and the father of the children who had lived together only in Tennessee, made a trip to Alabama for the sole purpose of a formal marriage. That marriage, under Alabama statute, legitimated the children. The Tennessee Supreme Court held that, as the policy and consequences of legitimating statutes were substantially the same in both states, the legitimation in Alabama was effective in Tennessee. It has been held

elsewhere that domicile is material with respect to the validity of an out-of-state divorce. Williams v. North Carolina, 1945, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577, 157 A.L.R. 1366. But domicile has no bearing on the validity of a foreign marriage. Morgan v. McGhee, 1844, 24 Tenn. 13; Smith v. Mitchell, 1947, 185 Tenn. 57, 202 S.W.2d 979.

On the basis of the foregoing, the Court is of the opinion, and so holds, that Mary Jean Madewell is the legal widow of Orville O. Madewell, the insured, and is entitled as his widow to the benefits of his National Service Life Insurance. Let appropriate orders be prepared accordingly.