# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 30, 2014 Session

## DOROTHY LEWIS v. SAM LEWIS ET AL.

**Appeal from the Circuit Court for Polk County**
**No. 12-CV-49     J. Michael Sharp, Judge**

---

**No. E2014-00105-COA-R3-CV-FILED-APRIL 27, 2015**

---

Dorothy Lewis and Roscoe Lewis, although not legally married, held themselves out as husband and wife for over 41 years. At an earlier time, Roscoe Lewis had been married. He had three sons by that marriage, one of whom is the defendant Sam Lewis. In 2010, after Roscoe Lewis' health declined, Sam Lewis took care of his father and Dorothy. On April 7, 2011, Sam Lewis took his father to several banks. While there, Roscoe Lewis authorized the banks to add the names of Sam Lewis and Dorothy to multiple accounts that had previously been only in Roscoe Lewis' name.[1] On April 26, 2011, Dorothy and Roscoe Lewis each executed an individual power of attorney granting Sam Lewis authority and control over their financial and medical decisions. On that same day, Dorothy and Roscoe Lewis executed a warranty deed conveying a remainder interest in their home and farm to Sam Lewis and his wife Lora Lewis for $40,000, less than one-third of the fair market value as found by the trial court. On March 9, 2012, two days before Roscoe Lewis died, Sam Lewis withdrew funds totaling over $600,000 from the accounts held jointly in the names of Sam, Roscoe, and Dorothy Lewis. He placed the withdrawn funds in accounts held in the names of Sam Lewis and his wife, Lora Lewis. Dorothy Lewis brought this action alleging, among other things, that the real estate and bank account transfers should be rescinded because of Sam Lewis' undue influence on his father and Dorothy. The trial court found and held (1) that Sam Lewis exercised undue influence over them and (2) that he committed conversion and fraud. The court's judgment against Sam Lewis included an award of attorney's fees to Dorothy Lewis. The same fees were also awarded against a constructive trust established by the trial court. On appeal, we hold that the trial court's award of attorney's fees against the constructive trust is not supported by the evidence or by any legal or equitable principle. As a consequence of this holding, we reverse the trial court's order granting attorney's fees

---

[1] As will be seen, five of these accounts designated Dorothy Lewis as the "pay-on-death beneficiary."

against the constructive trust created by the trial court for the use and benefit of Dorothy Lewis during her lifetime. In all other respects, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

H. Franklin Chancey, Cleveland, Tennessee, for the appellant, Sam Lewis.

Joshua H. Jenne and Michael E. Jenne, Cleveland, Tennessee, for the appellee, Dorothy Lewis, in her individual capacity and by Roy Waters, her brother and next friend.

Ginger Wilson Buchanan, Cleveland, Tennessee, administrator for the appellee, estate of Roscoe Lewis.

## OPINION

### I.

Roscoe Lewis and Laura Lee Lewis were married on December 17, 1949. As previously noted, they had three sons. They separated on November 16, 1970, and were divorced by final order of a Georgia court, executed on December 4, 1972 and entered of record on March 28, 1973. Dorothy Lewis alleges that she and Roscoe Lewis were wed in a church ceremony in Alabama in February of 1972. On this point, the trial court found as follows:

> Roscoe Lewis purportedly married Dorothy Lewis on February 14, 1971, somewhere in the State of Alabama (this is based upon a prior hearing of this court, wherein Dorothy Lewis testified that she and Roscoe Lewis were married in a small church somewhere in Alabama). However, the court finds, based upon the trial exhibits entered with the court, that the State of Alabama Department of Public Health Center for Health Statistics and Office of Vital Records issued a certificate of failure to find any record of marriage to exist for Roscoe Lewis and Dorothy Lewis, the records having been searched for the years 1970 through 1980. . . . However, [Dorothy Lewis] presented proof through a copy of a page from the family bible, "certificate of marriage" certifying that

Roscoe Lewis and Dorothy Waters were married on February 2, 1971[2] in holy matrimony.

*        *        *

The court finds that at all times from and after February of 1971, Roscoe and Dorothy Lewis held themselves out to be man and wife, and the evidence before the court is that they lived together at all times as man and wife from February of 1971 through the date of Roscoe Lewis' death on March 11, 2012. . . . [A]t all times from February 1971 through March 11, 2012, Roscoe Lewis and Dorothy Lewis held most of their bank accounts together as man and wife, and generally speaking, conducted their business affairs as man and wife.

During the last decade of Roscoe Lewis' life, Dorothy Lewis suffered from significant mental disabilities. The trial court, relying, among other proof, on the testimony of her personal physician, found that she was mentally incompetent during this time, as further discussed below. In 2010, Roscoe Lewis' physical health began a serious decline. Sam Lewis started taking care of his father and Dorothy Lewis on a full-time basis around December of 2010.

On April 7, 2011, Sam Lewis drove his father to three financial institutions: BB&T, United Community Bank, and Copper Basin Federal Credit Union. Dorothy Lewis was with them for the trip to BB&T, but Sam Lewis dropped her off at her house before the other banks were visited. At the banks, the account holder names on numerous accounts owned by Roscoe Lewis were changed to add the names of Sam Lewis and Dorothy Lewis. Prior to the change, five of the accounts had been owned by Roscoe Lewis with Dorothy Lewis designated as the pay-on-death beneficiary. The total amount of money in these five accounts at that time approximated $520,000. Two other accounts were owned by Roscoe Lewis with no pay-on-death beneficiary. There was about $100,000 in those two accounts.

On April 26, 2011, Roscoe and Dorothy Lewis executed several legal documents drafted by attorney Laura Crawford, who visited their home on that date. They each executed two durable powers of attorney in favor of Sam Lewis, one for healthcare decisions and the other for financial matters. They also executed a warranty deed

---

[2] There was some proof presented suggesting that the ceremony occurred on February 2, 1971, and other proof that it happened on February 14. Obviously, this discrepancy is not material to our analysis.

conveying a remainder interest in the marital[3] real property – being their house and approximately fourteen acres – to Sam Lewis and his wife, Lora Lewis. Dorothy and Roscoe Lewis retained a life estate. In consideration for the transfer, Sam and Lora Lewis executed a promissory note and deed of trust in the amount of $40,000. The promissory note provided for "interest at the rate of ZERO percent (0%) per annum in 400 monthly installments of principal in the amount of $100.00 each." (Capitalization in original.) The trial court found that the fair market value of the marital residence at that time was "a little in excess of $130,000."

Roscoe Lewis' health, including a condition of adenocarcinoma,[4] continued to decline due to his several illnesses. On March 6, 2012, he was admitted to the hospital. He died five days later. On March 9, 2012, while Roscoe Lewis was still alive, Sam Lewis withdrew the funds in the accounts held in the joint names of Sam Lewis, Roscoe Lewis, and Dorothy Lewis. He deposited these funds, over $600,000, in three accounts, all of which were in his name and the name of his wife. One of the accounts designated the daughter of Sam and Lora Lewis as the pay-on-death beneficiary. Sam Lewis did not tell either Roscoe or Dorothy Lewis about these transfers. He admitted that, after the transfers, Dorothy Lewis no longer had access to the funds. As previously noted, Roscoe Lewis died on March 11, 2012, at the age of 83.

After Roscoe Lewis' death, Dorothy Lewis' brother, Roy Waters, came from Georgia to assist his sister. Both Sam Lewis and Waters testified that a day or two after the funeral, Sam Lewis told Waters to get off his property – the former marital residence of Roscoe and Dorothy Lewis, where Dorothy Lewis was then still residing. At some point shortly after Roscoe's funeral, Dorothy Lewis asked Waters to take her to BB&T to see how much money was in the bank accounts there. They discovered that all, or nearly all, of the funds had been removed by Sam Lewis. Shortly thereafter, Dorothy Lewis went to live with her brother in Georgia.

Dorothy Lewis filed her complaint on March 23, 2012. She alleged that Sam Lewis wrongfully appropriated and converted the funds in the bank accounts by the exercise of undue influence, fraud and deceit, and breach of fiduciary duty. She asked the trial court, among other things, to rescind the real estate transaction regarding the marital real property. Later, when Dorothy Lewis' mental capacity was called into question, an amended complaint was filed in her individual capacity and by her next friend and brother, Roy Waters. After Dorothy Lewis suffered a debilitating stroke, Roy Waters and his son were named her co-conservators.

---

[3] We recognize that "marital" is not an appropriate modifier since these parties were never married. We use it, however, as a convenient way of referring to their jointly owned property.

[4] A type of cancer that forms in mucus-secreting glands throughout the body.

4

After a two-day bench trial, the court found and held that: (1) Roscoe and Dorothy Lewis were never "legally" married and, consequently, did not own the marital residence and other joint assets as tenants by the entireties; (2) the transfer of the marital residence "fails due to the incompetency of Dorothy Lewis as well as the mental capacity of Roscoe Lewis at the time, as well as the undue influence and coercion of Sam Lewis"; (3) the transfer of ownership of the bank accounts at issue was the product of undue influence resulting from a confidential relationship abused by Sam Lewis; and (4) Sam Lewis was guilty of fraud and conversion of funds rightfully belonging to Dorothy Lewis.

Based upon these findings, the trial court held that the marital real estate was owned one-half by Dorothy Lewis and one-half by Roscoe Lewis' estate, as tenants in common, and ordered that it be sold and the proceeds divided accordingly. Regarding the monies in the bank accounts, the trial court ordered as follows:

> [A]ll of the funds shall be returned to their status prior to any changes of ownership that were made on April 7, 2011. . . . All bank accounts, other than the two accounts noted above, had [pay-on-death] beneficiary designations, which shall control the payment of those accounts based upon the death of Roscoe Lewis.
>
> With regard to any accounts payable to the estate of Roscoe Lewis at his death, as there was no [pay-on-death] beneficiary designation controlling those accounts at this death, the court finds that those accounts shall be paid into the estate of Roscoe Lewis, and the funds used as set out herein.
>
> With regard to all of the funds payable to the estate of Roscoe Lewis, . . . there is no question that Roscoe Lewis intended his funds and/or assets to be used for the use and benefit of Dorothy Lewis for the remainder of her life. He expressly indicated this to his son Sam Lewis, and the court finds that based upon the fact that he held himself out to be the husband of Dorothy Lewis for a period in excess of 41 years in the community, and that they spent all of their 41 years together in the same home, working toward the same apparent goals and ambitions, the court finds that the funds belonging to the estate of Roscoe Lewis shall be deposited into and held in a constructive trust for the use and benefit of Dorothy Lewis for

5

the remainder of her life. A trustee shall be appointed to oversee this trust.

The trial court further ordered "that Sam Lewis shall be responsible for the attorney fees and court costs of Dorothy Lewis, as well as the costs incurred in this matter." The sole ground stated by the trial court to support the award of attorney's fees was the trial court's finding that Sam Lewis was guilty of fraud, a cause of action now appropriately called intentional misrepresentation.[5]

Sam and Lora Lewis filed a motion to alter or amend, and the estate of Roscoe Lewis filed a motion for clarification of the trial court's order. Dorothy Lewis died on December 18, 2013. The trial court entered a final order addressing the remaining motions on January 24, 2014, stating in pertinent part as follows:

> The Court at a hearing conducted January 7, 2014 in chambers, . . . reiterated . . . that the assets of Roscoe Lewis, including the bank accounts solely in the name of Roscoe Lewis existing as of April 7, 2011, and Roscoe Lewis' 50% of the proceeds realized from the sale of the real property, should be placed into Trust for the use and benefit of Dorothy Lewis during her natural lifetime. . . . [A]ll expenses associated with her care and maintenance from and after the death of Roscoe Lewis until Dorothy Lewis' death which occurred December 18, 2013 shall be paid from said Trust and reimbursed to the Conservator, Roy Waters, as herein provided. In addition, it is the intention of the Court and Order that the attorney fees and expenses which were incurred on behalf of Dorothy Lewis and awarded to Jenne, Scott & Jenne totaling $92,675.76 be paid from said Trust funds. Upon payment of said amount to Jenne, Scott & Jenne from said Trust funds, Jenne, Scott & Jenne and for the Estate of Dorothy Lewis shall assign to said Trust the Judgment rendered against Sam Lewis for attorney fees and expenses totaling $92,675.76.

Sam Lewis timely filed a notice of appeal.

---

[5] In *Hodge v. Craig*, 382 S.W.3d 325, 342-43 (Tenn. 2012), the Supreme Court observed that "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are different names for the same cause of action, and suggested that the term intentional misrepresentation "should be used exclusively henceforth."

II.

The issues presented are as follows:

(1) Whether the trial court erred in its determination that the marriage of Roscoe Lewis and Dorothy Lewis was bigamous and therefore void.

(2) Whether the trial court erred in finding that Sam Lewis abused a confidential relationship and exercised undue influence over his father, Roscoe Lewis, and Dorothy Lewis.

(3) Whether the trial court erred in its award of the real estate and bank accounts at issue.

(4) Whether the trial court erred in its award of attorney's fees and costs against Sam Lewis in the amount of $92,675.76 and in taxing those expenses to the constructive trust created by the trial court.

(5) Whether the appellee, estate of Dorothy Lewis, should be awarded attorney's fees and expenses incurred on appeal.

III.

Our review of this non-jury case is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court's factual findings, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). "When the resolution of an issue depends upon the credibility of witnesses, '[t]he weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.' " *In re Conservatorship of Tate*, No. M2010-01904-COA-R3-CV, 2011 WL 6935342 at *3 (Tenn. Ct. App. M.S., filed Dec. 29, 2011). We review the trial court's conclusions of law de novo with no presumption of correctness. *Oakes v. Oakes*, 235 S.W.3d 152, 156 (Tenn. Ct. App. 2007).

IV.

A.

The estate of Dorothy Lewis, citing several earlier Tennessee cases,[6] argues that she was validly and legally married to Roscoe Lewis, and, in the alternative, the doctrine of estoppel by marriage should apply under these circumstances, *i.e.*, where they held themselves out as married for over forty-one years. She relies on these arguments to overcome any denial of or challenge to the marriage. The trial court ruled as follows on this issue:

> While this court is deeply troubled by the fact that there is no question . . . that Dorothy Lewis as well as Roscoe Lewis believed themselves to be legally and validly married, the court finds that Roscoe Lewis . . . did not in fact become legally and validly divorced until December 4, 1972. Therefore, based upon the applicable law as set out by the Tennessee Supreme Court, this court has no choice but to find that Roscoe Lewis and Dorothy Lewis' marriage was a bigamous marriage that is prohibited by statute, and it is therefore void. This court has no alternative but to find that the marriage of Roscoe Lewis and wife Dorothy Lewis, for legal purposes, must be treated as if it has never been. . . . Therefore, the court finds that Roscoe Lewis and Dorothy Lewis must stand in the same relationship as if their marriage never occurred. This court cannot recognize a bigamous marriage, nor can the bigamous marriage of Roscoe Lewis and Dorothy Lewis be ratified by them, by their actions or otherwise. The court finds that the application of marriage by estoppel in this case would result in this court's recognition of a void marriage that the parties cannot ratify, and neither can this court. The court finds that the application of marriage by estoppel in this case would contravene T.C.A. § 36-3-102.[7]

---

[6] *See* **King v. Clinchfield R.R. Co.**, 131 F.Supp. 218 (E.D. Tenn. 1955); **Hale v. State**, 164 S.W.2d 822 (Tenn. 1942); **Smith v. N. Memphis Savings Bank**, 89 S.W. 392 (Tenn. 1905); **Bohlen-Huse Coal & Ice Co. v. McDaniel**, 257 S.W. 848 (Tenn. 1924); **Madewell v. U.S.**, 84 F. Supp. 329 (E.D. Tenn. 1949); **Bryant v. Townsend**, 221 S.W.2d 949 (Tenn. 1949); **Bower v. Lunney**, 178 S.W.2d 91 (Tenn. Ct. App. 1943).

[7] Tenn. Code Ann. § 36-3-102 provides that "[a] second marriage cannot be contracted before the dissolution of the first."

(Footnote added; internal citations omitted).

The trial court correctly noted that the controlling principles on this issue were set forth by the Supreme Court in the 2006 case of *Guzman v. Alvares*, 205 S.W.3d 375 (Tenn. 2006). In *Guzman*, the High Court said:

> Except as restricted by constitutional provisions, the inception, duration, status, conditions, and termination of a marriage in Tennessee are subject to state legislative power and control. *Crawford v. Crawford*, 198 Tenn. 9, 277 S.W.2d 389, 391 (1955); *see Martin v. Coleman*, 19 S.W.3d 757, 760 (Tenn. 2000). Common-law marriages are not recognized in Tennessee. *Martin*, 19 S.W.3d at 760. Our state's legislature also prohibits bigamous marriages. *See* Tenn. Code Ann. § 36–3–102 (2005) ("A second marriage cannot be contracted before the dissolution of the first."). Tennessee Code Annotated section 36–3–306 (2005) further provides that "[n]o marriage shall be valid, whether consummated by ceremony or otherwise, if the marriage is prohibited in this state."

> \*    \*    \*

> We next examine whether a marriage in this case can be created by estoppel. In a case of marriage by estoppel, the marriage is presumed to be valid even though it is not technically lawful. *Crawford*, 277 S.W.2d at 391. Marriage by estoppel is invoked "to prevent fraud as well as to preserve the rights of innocent third persons who would be adversely affected by the conduct of the parties." *Id*. This doctrine is applicable only in exceptional circumstances. *Martin*, 19 S.W.3d at 760.

> When one of the parties to the purported marriage seeks to invoke the doctrine of marriage by estoppel in a case against the other party to the marriage, this Court has refused to apply the doctrine when the parties entered into a bigamous marriage, regardless of either party's knowledge of the impediment.

> \*    \*    \*

9

In accordance with section 36–3–102, parties seeking to enter into a subsequent marriage lack the capacity to marry until each party's prior marriage is dissolved.

Because bigamous marriages are prohibited by statute, such marriages are void from the beginning. The parties to a bigamous marriage stand in the same relationship as if the subsequent marriage never occurred. Bigamous marriages are not recognized by the courts and cannot be ratified by the parties.

. . . The application of marriage by estoppel to a void, bigamous marriage under these circumstances would result in the court's recognition of a void marriage that the parties cannot ratify. Furthermore, application of the doctrine would contravene Tennessee Code Annotated sections 36–3–102 and 36–3–306 and the public policy of this state by condoning the bigamous marriage.

We conclude that the applicable statutes, our prior case law, and the public policy of this state prohibit the application of the marriage by estoppel doctrine to void, bigamous marriages.

*Id.* at 379-81 (internal citations omitted). In accordance with these principles, the trial court correctly held that the marriage at issue here was bigamous, void, and cannot be made valid by the doctrine of estoppel.

B.

Sam Lewis argues that the trial court erred in finding that he exercised undue influence by abusing or taking advantage of a confidential relationship with his father, Roscoe Lewis, and Dorothy Lewis.

In *Austin v. Wilds*, No. E2013-01310-COA-R3-CV, 2014 WL 1607356 (Tenn. Ct. App. E.S., filed Apr. 22, 2014), we recently discussed the principles applicable to a claim of undue influence, stating as follows in pertinent part:

Courts apply the doctrine of undue influence "when one party, such as a grantee, is in a position to exercise undue

influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship." *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). In *Iacometti v. Frassinelli*, we discussed the nature of a confidential relationship as follows:

> It is that relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party, such as nurse and invalid, trusted business adviser and friend etc. Proof of the existence of the normal family relationship between a parent and adult child, standing alone, does not give rise to an inference or presumption that either one exercises any dominion and control over the other.

*Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973). A trial court's conclusions regarding whether a confidential relationship existed or a person exercised undue influence over another are questions of fact. *Gibson v. Gibson*, No. W2004-00005-COA-R3-CV, 2004 WL 2464271, at *3 (Tenn. Ct. App. W.S., Nov. 2, 2004).

In Tennessee, a presumption of undue influence arises when there is a confidential relationship followed by a transaction in which the dominant party receives a benefit from the other party. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). The burden of proof for these elements rests with the party who alleges the confidential relationship. *Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002). However, once that party establishes a presumption of undue influence, the burden of proof shifts to the dominant party to rebut the presumption by clear and convincing evidence of the fairness of the transaction. *Id.*

2014 WL 1607356 at *8 (quoting *In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008) (internal citations omitted)).

As this court has further stated regarding the undue influence doctrine:

"The most common way of establishing the existence of undue influence is 'by proving the existence of suspicious circumstances warranting the conclusion that the [action] was not the [decedent's] free and independent act.' " *Estate of Hamilton v. Morris*, 67 S.W.3d 786, 792 (Tenn. Ct. App. 2001). The most frequently used "suspicious" circumstances are: "(1) a confidential relationship between the testator and the beneficiary; (2) the testator's poor physical and mental condition; and (3) the beneficiary's involvement in the procurement of the will in question." *Id*. However, other suspicious circumstances are also recognized: "(1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator." *Id*. at 792-93 .

Although there exists no prescribed number of suspicious circumstances which must be met in order to invalidate an action, "the doctrine of undue influence is applicable only where there is a confidential relationship[.]" "Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is." *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). However, "[i]n general terms, it is any relationship that gives one person the ability to exercise dominion and control over another."

Confidential relationships come from two sources: "(1) 'legal confidential relationships' and (2) 'family and other relationships.' " *In re Estate of Brevard*, 213 S.W.3d at 302-03. "A 'legal confidential relationship' is a 'fiduciary relationship . . . or any other relationship where the law prohibits gifts or dealing between the parties.' " *Id*. *Fiduciary relationships are confidential per se*, but do not "make out a *prima facie* claim of undue influence unless the contestant establishes an additional suspicious

12

circumstance[.]" ***Id***. However, family relationships are not confidential *per se* and thus, "the contestants must prove the elements of domination and control in order to establish the existence of a confidential relationship." ***Id.*** Proof of a family relationship "coupled with proof of domination and control" establishes a confidential relationship, "but does not make out a *prima facie* claim of undue influence unless an additional suspicious circumstance exists." ***Id.*** Thus, *the existence of a fiduciary relationship presumes a confidential relationship*, while a family relationship requires proof of "domination and control" to establish that a confidential relationship exists.

***Waller v. Evans***, No. M2008-00312-COA-R3-CV, 2009 WL 723519 at *6-7 (Tenn. Ct. App. W.S., filed Mar. 17, 2009) (brackets in original; emphasis added; internal citations omitted). Although what we said in ***Waller*** was in the context of a will contest – one of the more frequent actions that may involve an undue influence claim – much of it is generally applicable to a claim of undue influence in another context, such as this one.

The trial court, in its thorough 32-page memorandum opinion and order, recognized and applied these principles and stated as follows on this point:

> [O]n or about April 7, 2011, Sam Lewis' name was added to numerous bank accounts belonging to Roscoe Lewis and/or Roscoe Lewis and Dorothy Lewis at BB&T, United Community Bank, and Copper Basin Federal Credit Union. . . . Sam Lewis is the individual who drove both Roscoe Lewis and Dorothy Lewis to each of the banks to make the changes wherein his name was added to the accounts and/or CDs. The court finds that during the last two years of Roscoe Lewis' life, Roscoe Lewis suffered from serious health related conditions that ultimately resulted in his death in March of 2012. The court finds that these bank accounts were all changed during the time when Roscoe Lewis was suffering from extreme poor health related issues.
>
> \*     \*     \*
>
> While the court heard much testimony that Roscoe Lewis was stubborn, independent, and an independent thinker, the court is also convinced that Roscoe Lewis deeply loved Dorothy

Lewis, who he believed to be his wife. The court believes that he deeply loved Dorothy Lewis to the point that he, by his son's own admission, thoroughly and directly instructed his son that he was to take care of Dorothy Lewis when Roscoe Lewis was dead and no longer able to do so. Sam Lewis testified, based upon his discussions and agreement with his father, that he would be responsible to see to and to take care of Dorothy Lewis after Roscoe Lewis was dead. He testified that this was his father's stated intention.

\* \* \*

[T]his was all done at a time when Roscoe Lewis was gravely ill, so ill in fact that his son was the person primarily responsible to take him to and from his doctor's appointments, his son was the one seeing to h[im] and Dorothy on a nearly daily basis, and his son was the one who was assisting him in nearly every aspect of his life. Yet, the testimony remains that he was a stubborn and independent man most all the days of his life.

\* \* \*

[T]he court finds that Roscoe Lewis was also suffering from great stress and he was gravely ill at the time this purported gift and sale took place. This court finds Roscoe Lewis to be suffering under some outside influence, from his son and possibly based upon his own personal fears and worries, such that his mental capacity was impaired enough that he entered into an unconscionable agreement that defies not only financial logic, but common sense as well. . . . Based upon all of the above, the court finds that the transfer of this real estate fails due to the incompetency of Dorothy Lewis as well as the mental capacity of Roscoe Lewis at the time, as well as the undue influence and coercion of Sam Lewis.

\* \* \*

There is no question that there was a power of attorney executed here. However, the power of attorney was not used in changing the accounts that were previously just in the

name of Roscoe Lewis and Dorothy Lewis. Roscoe Lewis, Dorothy Lewis, and Sam Lewis simply went to the bank and executed the requisite documents to make the changes. However, there is also no question, based upon the testimony and all of the proof and exhibits presented in this trial, that Sam Lewis had an agreement with his father to use the funds to take care of not only Roscoe Lewis but Dorothy Lewis as well, once Roscoe was gone. The court finds it very moving that during the times when Roscoe Lewis was gravely ill and without the knowledge of either Roscoe or Dorothy Lewis, Sam Lewis later went to the bank and had all of the bank accounts transferred into another account solely in his name and his wife's name, and/or solely in his name and listing his wife as a payable on death beneficiary or his daughter as a beneficiary. This, based upon all of the proof and evidence in this case, was never Roscoe Lewis' intention, nor is there any proof that this was ever discussed by Roscoe Lewis with Sam Lewis. It is clear that Sam Lewis took these actions on his own, without giving Roscoe Lewis or Dorothy Lewis any notice of these actions. This act of Sam Lewis is found by the court to be an unlawful conversion by Sam Lewis of these accounts. Furthermore, the court finds that Sam Lewis admitted that not only was Dorothy Lewis not aware of his having changed these accounts, Sam Lewis also admitted in his testimony that Dorothy Lewis had no access whatsoever to these accounts, nor, without the filing of this lawsuit, would Dorothy Lewis ever have known that the monies had been moved and what the legal account status was after Sam Lewis made these changes. The court finds that these circumstances are not only suspicious, given Dorothy Lewis' mental deterioration and overall mental and physical capacity, they are also extremely disturbing, given Roscoe Lewis' mental and physical deterioration. The court finds that Sam Lewis is the one who took Roscoe and Dorothy Lewis to the banks, and Sam Lewis was the one who was in fact advising Roscoe Lewis at the time that all of these changes were made. . . . The court finds that both Roscoe Lewis and Dorothy Lewis were not only suffering from physical and mental deterioration, they were of an extremely advanced age and lacked the business savvy and/or understanding to know the

full ramifications of what changing the accounts might have meant.

It is undisputed that Sam Lewis was attorney-in-fact for Roscoe and Dorothy Lewis as a result of the powers of attorney for healthcare and financial matters executed on April 26, 2011. Generally speaking, "a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." ***In re Estate of Farmer***, No. M2013-02506-COA-R3-CV, 2014 WL 5308226 at *9 (Tenn. Ct. App. M.S., filed Oct. 15, 2014) (quoting ***Childress v. Currie***, 74 S.W.3d 324, 328-29 (Tenn. 2002)); ***In re Estate of Price***, 273 S.W.3d at 125. As we observed in ***Estate of Price***,

> However, there are exceptions to this rule. In ***Childress v. Currie***, our Supreme Court held that "an unexercised power of attorney does not in and of itself create a confidential relationship." ***Id.*** at 329. The High Court explained its reasoning as follows: "When an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." ***Id.***

273 S.W.3d at 125.

The trial court correctly stated that Sam Lewis did not exercise his powers of attorney in changing the names on the bank accounts, because they had not yet been executed then. They were in effect, however, when Sam Lewis returned to the banks to withdraw the finds and transfer them to his own accounts. Furthermore, in his answer to the amended complaint, Sam Lewis stated the following:

> It is admitted that Defendant Sam Lewis was designated as attorney in fact by Durable Power of Attorney (DPA) on April 26, 2011. This was done at the request of Roscoe and Dorothy Lewis and with the assistance of their own independent legal counsel. The defendant never used this DPA for any purpose *except* to have the mailing address changed at about the time of Roscoe Lewis['] death, *and to protect the assets of Roscoe Lewis, Dorothy Lewis and Sam Lewis*.

\*     \*     \*

16

It is admitted that in the days immediately prior to the death of Roscoe Lewis, [Sam Lewis] caused certain bank accounts to be transferred from a joint account owned by Roscoe Lewis, Dorothy Lewis and Sam Lewis into accounts that were titled to Sam Lewis and his wife Lora Lewis. The purpose of this action was to protect the assets from Roy Waters. . . . Out of an abundance of caution, and to preserve the funds, Sam Lewis had the funds held in joint accounts in his name, Dorothy Lewis['] and Roscoe Lewis['] name transferred over to his and Lora Lewis['] name. Sam Lewis considered these funds to belong to both he [*sic*] and Dorothy Lewis, after the death of his father *and that these funds were held by him in a fiduciary capacity*, until transferred to the Clerk of Courts by agreed order. *This authority was clearly vested in him by the [durable power of attorney] granted to him on April 26, 2011.*

(Emphasis added.) Sam Lewis' own allegation that the funds "were held by him in a fiduciary capacity" for Dorothy Lewis is supported by his testimony at trial. Sam Lewis testified that both Roscoe and Dorothy placed their trust and confidence in him, and that Roscoe Lewis relied on him to take care of Dorothy. Sam Lewis further testified:

Q: Now, this lawsuit in large part is about you having transferred these accounts from a joint account with Dorothy into accounts that were just in yours and your wife's name.

A: Yes, sir.

Q: Why did you do that, Mr. Lewis?

A: I did that for solely protection[8] for [*sic*] me and Dorothy – me and Dot. I call her Dot. I don't call her Dorothy.

\* \* \*

Q: We talked about this a little bit, Mr. Lewis, but after your dad's death or around the time of your dad's death you've

---

[8] There is no proof in the record why the funds were not secure prior to the transfer into the personal account of Sam Lewis and his wife.

acknowledged that the funds that we've discussed were, in your mind, held for Dorothy's benefit? For her protection?

A: Say that again.

Q: You've acknowledged, sir, that after or around the time of your dad's death the bank accounts, the money that we've talked about, you were holding them for Dorothy's protection?

A: That money after my dad died belonged to me and Dorothy. Yeah.

Q: And when we talked about this in your deposition, Mr. Lewis, you indicated to me that if Dorothy needs all of this money during her lifetime that it's hers. Remember telling me that?

A: My obligation to my dad was to take care of her as long as she lived, whatever it took.

Q: And if she needed all that money for her reasons –

A: I said, so be it.

Considering the above-quoted evidence, and the totality of circumstances as presented by the proof in the record, we hold that the trial court did not err in finding that a confidential relationship existed between Sam Lewis on the one hand, and Roscoe and Dorothy Lewis.

The trial court further correctly found several suspicious circumstances, including Roscoe Lewis' advanced age and poor physical and mental condition near the end of his life, the discrepancies between the clearly stated intentions of Roscoe Lewis and what Sam Lewis actually did with the bank account funds and marital residence, and the secrecy of the surreptitious transfer of funds, made solely for Sam Lewis' benefit, two days before Roscoe Lewis' death. "A trial court's conclusions regarding whether a confidential relationship existed or a person exercised undue influence over another are questions of fact." *In re Estate of Price*, 273 S.W.3d at 125. Many of these factual findings were dependent upon the trial court's live observation of the witnesses and its assessment of their credibility. The trial court specifically made four separate findings in its memorandum opinion and order that "Sam Lewis' testimony . . . is not credible, and

18

that it is completely incredible."  Regarding the source and rightful ownership of the bank account funds, the trial court found:

> While the court heard testimony from Sam Lewis that he contributed funds to some of the accounts and/or participated in enterprises wherein funds were earned and later deposited into these accounts, the court finds absolutely no proof that this is true.  The court finds that all or at least the overwhelming majority of all of the funds in these bank accounts came from the personal enterprises of Roscoe Lewis and Dorothy Lewis and their years of work together, and their years of very simple and frugal living throughout their more than 41 years together.  The court finds that Sam Lewis' testimony was again not credible pertaining to these bank accounts, and was in fact incredible, given all of the facts and evidence.  The court finds that the realities of the ownership of these funds in these accounts derive solely from the efforts of Roscoe Lewis and Dorothy Lewis.

The evidence does not preponderate against these findings of fact made by the trial court.

The trial court also found that "during the last several years (more than 10) of Roscoe Lewis' life, Dorothy Lewis suffered from extreme mental health related issues" and that she "was mentally incompetent and unable to manage her affairs."  In making this finding, the court relied on the deposition testimony of Dorothy Lewis' treating physician, who, according to the trial court's memorandum opinion and order, testified that "he did not believe Dorothy Lewis to be mentally competent"; she "would not understand what signing a power of attorney meant, nor a deed, nor any other financial document"; she "could be easily manipulated and . . . unduly influenced by others"; that she "suffered from a low I.Q." and "was simple-minded"; and "could not manage her financial affairs, nor . . . her health care affairs."  The issue of Dorothy Lewis' mental capacity was not seriously disputed by Sam Lewis at trial, and he does not argue on appeal that the trial court incorrectly found her mentally incompetent.  The evidence does not preponderate against the trial court's decision to set aside the real estate transfer of the marital residence on grounds of mental incompetency and undue influence.

## C.

On appeal, both Sam Lewis and the estate of Roscoe Lewis challenge the trial court's award of attorney's fees against Sam Lewis and against the constructive trust

created for Dorothy Lewis' use and benefit during her lifetime.[9]  The general rule regarding an award of attorney's fees is as stated by this Court in **Roberts v. Sanders**, No. M1998-00957-COA-R3-CV, 2002 WL 256740 at \*10 (Tenn. Ct. App. M.S., filed Feb. 22, 2002):

> Tennessee follows the "American Rule" with regard to awarding attorney's fees.  Under the American Rule, litigants are responsible for their own attorney's fees no matter "however wrongful may have been the suit, or however groundless the defense."  **Corinth Bank & Trust Co. v. Security Nat'l Bank**, 148 Tenn. 136, 154, 252 S.W. 1001, 1006 (1923).  Each litigant must wage its own fight for justice with its own resources.  James H. Cheek, III, Note, *Attorney's Fees: Where Shall the Ultimate Burden Lie*, 20 Vand. L. Rev. 1216, 1221 (1967).  Thus, in the absence of some statutory, contractual, or equitable ground, a litigant must pay for its own lawyer and, conversely, cannot be required to pay for another litigant's lawyer.  **State v. Brown & Williamson Tobacco Corp.**, 18 S.W.3d 186, 194 (Tenn. 2000); **Kultura, Inc. v. Southern Leasing Corp.**, 923 S.W.2d 536, 540 (Tenn. 1996); **Brooks v. Lambert**, 15 S.W.3d 482, 485 (Tenn. Ct. App. 1999).

In the present case, there is no statutory or contractual ground supporting the award of attorney's fees.  The trial court held that Sam Lewis wrongfully converted the funds in the bank accounts at issue.  However, we have previously held that a finding of conversion does not necessarily support an award of attorney's fees, stating as follows:

> The trial court found that the money was wrongfully converted by Mrs. Kilpatrick.  Regardless of whether Mrs.

---

[9] As we have already stated, the trial court ordered that:

> [T]he attorney fees and expenses which were incurred on behalf of Dorothy Lewis and awarded to Jenne, Scott & Jenne totaling $92.675.76 be paid from said Trust funds.  Upon payment of said amount to Jenne, Scott & Jenne from said Trust funds, Jenne, Scott & Jenne and for the Estate of Dorothy Lewis shall assign to said Trust the Judgment rendered against Sam Lewis for attorney fees and expenses[.]

While the trial court clearly intended for Sam Lewis to be ultimately responsible for the attorney's fees, this order is tantamount to a judgment against the constructive trust, and we review it as such.

Kilpatrick is liable for conversion, such a finding does not mean that, as a tortfeasor, she is liable for attorney's fees.

\*       \*       \*

[I]n *Glazer v. First Am. Nat'l Bank*, No. 02A01-9308-CH-00185, 1995 Tenn.App. LEXIS 348 (Tenn. Ct. App. May 25, 1995) (later reversed on different grounds by *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546 (Tenn.1996)), this court specifically held that the trial court's award of attorney's fees as part of a consequential damage award to the plaintiff in a conversion case was not appropriate. The court stated that:

> Because there has been no allegation of a statutory or contractual provision for attorney's fees here, we find that the trial court's inclusion of Plaintiff's attorney's fees in its award of damages was unwarranted.

*Glazer*, 1995 Tenn.App. LEXIS 348, at \*15. This conclusion is consistent with Tennessee's adherence to the American Rule.

Tennessee courts have long rejected attempts to include attorney's fees as a part of damages, "concluding that an award of attorney's fees as part of the prevailing party's damages is contrary to public policy." *John Kohl & Co. P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). In *John Kohl & Co*., the Supreme Court stated it was not persuaded that legal malpractice claims should be made an exception to the rule against awarding attorney's fees in the absence of an agreement or statute and held that attorney's fees in legal malpractice suits, "as in other litigation," may not be awarded. *Id*. No exception has been made for attorney's fees in conversion cases, either, and we find no basis for creating one. Therefore, the appellees cannot recover their attorney's fees from Mrs. Kilpatrick based on a finding of conversion.

*Carmical v. Kilpatrick*, No. M2002-00346-COA-R3-CV, 2002 WL 31863293 at \*5, 6 (Tenn. Ct. App. M.S., filed Dec. 23, 2002).

21

The trial court based its award of attorney's fees on its finding that Sam Lewis committed fraud or intentional misrepresentation. We have upheld an award of attorney's fees based on a finding of intentional misrepresentation. *Francis v. Barnes*, No. W2012-02316-COA-R3-CV, 2013 WL 5372851 at *11 (Tenn. Ct. App. W.S., filed Sept. 23, 2013) (citing *Hodge*, 382 S.W.3d at 343)). The trial court's findings and conclusions in this regard are as stated in its order as follows:

> At a minimum, the court finds that Sam Lewis has unlawfully converted all of the funds into his name. However, the court must go further and find, at least with regard to Dorothy Lewis, that Sam Lewis committed a fraud against Dorothy when he changed these accounts, given her mental capacity, and especially given the fact that Sam Lewis made later changes wherein he totally removed Dorothy Lewis from all of the accounts. He admitted he never told her he had done this and he admitted that Dorothy Lewis had no access or ownership interest in the accounts once he took the action of changing the accounts to just his and his wife's names. While the court understands that Roscoe and Sam discussed these accounts, the court finds that Sam Lewis also committed a fraud against Roscoe Lewis as well when he converted the accounts to his own name. The court finds that this was never Roscoe Lewis' intention for so long as Dorothy was alive, and Sam Lewis knew this and admitted this.
>
> *     *     *
>
> Finally, the court must consider the issue of whether or not Dorothy Lewis is entitled to her attorney fees and the costs in this action, due to the fraudulent actions and/or undue influence of Sam Lewis. Based upon all of the above, and based upon the totality of the circumstances, including not only the defendant's relationship with both Roscoe Lewis and Dorothy Lewis, their ill health and their lack of knowledge, sophistication, as well as their mental conditions and physical conditions and incapacities, the court finds that Sam Lewis is guilty of fraud in this case. The court finds specifically that Dorothy Lewis had no way of knowing the ramifications of her actions, and ultimately, no way of understanding or knowing what was being done to her throughout the course of

this case. The court finds it egregious what has occurred in this case, and the court takes judicial notice of the fact that during the pendency of this litigation, Dorothy Lewis has suffered not only the loss of her significant other of more than 41 years, she also suffered a debilitating stroke almost immediately after the loss of her loved one, and almost immediately after learning that all of the monies had been removed by Sam Lewis. Based upon all of the above, and based upon all of the findings set out in this order, the court finds that Sam Lewis shall be responsible for the attorney fees and court costs of Dorothy Lewis, as well as the costs incurred in this matter.

The elements of intentional misrepresentation are as follows:

To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation. *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012).

*Francis*, 2013 WL 5372851 at *9.

As can be seen from the above-quoted portion of the trial court's memorandum opinion and order, it made no finding that Sam Lewis made a false statement of a past or present fact. Furthermore, based on our review of the record, the evidence presented would not support such a finding. While we do not disagree with the trial court's observation that Sam Lewis' conduct was "disturbing" and "egregious" under the circumstances established by the proof, there was no evidence presented sufficient to establish that he was guilty of an intentional misrepresentation. The award of attorney's fees cannot be supported on this ground.

There is, however, another ground that clearly supports the trial court's award of attorney's fees against Sam Lewis. In *Martin v. Moore*, a case where a wife wrongfully

23

used her power of attorney executed by her disabled husband to withdraw funds from his bank account, we observed as follows:

> [S]everal cases of this court support the proposition that attorney fees may be awarded against a trustee who breaches [his or] her fiduciary duty. ***Brandt v. Bib Enterprises***, 986 S.W.2d 586 (Tenn Ct. App. 1998); ***Marshall v. First National Bank of Lewisburg***, 622 S.W.2d 558 (Tenn. Ct. App. 1981).
>
> Although attorney fees should not be imposed where there is merely a technical fault on the part of the fiduciary, 622 S.W.2d at 560, the imposition of such fees on fiduciaries who deliberately use their position of trust to enrich themselves creates a disincentive to such behavior. The trial court's finding that Ms. Moore intentionally withdrew her husband's separate funds from his checking account for her sole use and benefit is an appropriate predicate for the trial court's award.

109 S.W.3d 305, 313 (Tenn. Ct. App. 2003). Under ***Martin*** and the cases cited therein, the trial court was supported in awarding attorney's fees against Sam Lewis on the ground of his abuse of his fiduciary duty by deliberately using his position of trust to enrich himself at the expense of his ward, Dorothy Lewis.

Although the estate of Dorothy Lewis argues on appeal that the trial court's award was justified on the ground of its finding of intentional misrepresentation, the estate has not argued that it was justified on a finding of abuse of fiduciary duty. Nor did the trial court base its ruling on this ground, although we have held it to be the correct one. It is well established, however, that an appellate court "may affirm the judgment on grounds different from those relied upon by the lower courts when the lower courts have reached the correct result." ***In re Estate of Trigg***, 368 S.W.3d 483, 502 n.63 (Tenn. 2012) (citing ***State v. Hester***, 324 S.W.3d 1, 21 n.9 (Tenn. 2010); ***Continental Cas. Co. v. Smith***, 720 S.W.2d 48, 50 (Tenn. 1986); ***Hopkins v. Hopkins***, 572 S.W.2d 639, 641 (Tenn. 1978)). Moreover, Tenn. R. App. P. 36(b) provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." The facts, equities, and applicable law in this case dictate that "substantial justice" supports the trial court's award of attorney's fees against Sam Lewis.

The estate of Roscoe Lewis has raised the issue of whether the trial court erred in awarding attorney's fees against the constructive trust created by the trial court for the use and benefit of Dorothy Lewis, which trust contains all of the assets of the Roscoe Lewis estate. The estate argues that there is no principle of law providing an exception to the generally-prevailing American Rule as pertinent to the estate. We agree. We can find no legal or equitable ground supporting the award against the constructive trust, and consequently reverse the trial court's judgment making this award.

The estate of Dorothy Lewis argues that it should be awarded its attorney's fees and costs on appeal. We do not find this to be an appropriate case for such an award.

V.

The trial court's award of attorney's fees against the constructive trust for Dorothy Lewis' benefit is reversed. The trial court's judgment in all other respects, including the court's award of fees against Sam Lewis, is affirmed.[10] Costs on appeal are assessed to the appellant, Sam Lewis. The case is remanded to the trial court for enforcement of the trial court's judgment, as changed by us, and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

_____

[10] Our decision with respect to attorney's fees only pertains to the judgments against Sam Lewis and the constructive trust. The issues of whether fees are due from the Estate of Dorothy Lewis to her attorneys, and, if so, the amount of same, are not before us on this appeal.